**Office of the Attorney General**
**Elizabeth Barrett-Anderson**
Attorney General of Guam
**Litigation Division**
590 S. Marine Corps Drive
Tamuning, Guam 96913 ● USA
(671) 475-3324 ● (671) 472-2493 (Fax)

**Attorneys for the Government of Guam**

## IN THE DISTRICT COURT OF GUAM
## TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　vs.<br><br>GOVERNMENT OF GUAM,<br>CHAMORRO LAND TRUST<br>COMMISSION; ADMINISTRATIVE<br>DIRECTOR OF CHAMORRO LAND<br>TRUST,<br><br>　　　　　　　　　　Defendants. | CIVIL CASE NO. **17-00113**<br><br>**DEFENDANTS GOVERNMENT OF GUAM<br>and the ADMINISTRATIVE DIRECTOR<br>OF THE CHAMORRO LAND TRUST'S<br>OPPOSITION TO UNITED STATES'<br>MOTION FOR PARTIAL JUDGMENT ON<br>THE PLEADINGS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 1

ISSUES ............................................................................................................................... 9

    **A.** Whether Plaintiff's motion for judgment on the pleadings should be denied because the CLTA is authorized by federal law, does not discriminate on the basis of race and is rationally tied to the fulfillment of the United States' obligation to the indigenous people of Guam? ......................................................................... 9

    **B.** Whether Plaintiff's motion for judgment on the pleadings should be denied because it cannot show as a matter of law that an "invidious discriminatory purpose was a motivating factor" behind the CLTA? ............................................................... 9

    **C.** Whether Congress approved the CLTA through the enactment of the Guam Excess Lands Act (Pub. L. 103-339) in 1994? .......................................................... 9

DISCUSSION ...................................................................................................................... 9

    **A.** The CLTA does not discriminate on the basis of race in violation of the FHA because the act is authorized by federal law and is rationally tied to the fulfillment of the United States' obligation to the indigenous people of Guam ................................. 10

    **B.** Plaintiff's motion for judgment on the pleadings should be denied because it cannot show as a matter of law that an "invidious discriminatory purpose was a motivating factor" behind the CLTA .......................................................................... 17

    **C.** Congress impliedly approved the CLTA through the enactment of the Guam Excess Lands Act (Pub. L. 103-339) in 1994 ......................................................... 23

CONCLUSION .................................................................................................................... 24

**Federal Cases**

*Alaska Chapter, Associated Gen. Contractors of America v. Pierce,* 694 F.2d 1162 n. 10 (9th Cir. 1982).................................................................................12

*Arce v. Douglas,* 793 F.3d 968 (9th Cir. 2015) ..........................................................18

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)......................................................................18

*Avenue 6E Inv., LLC v. City of Yuma, Ariz.,* 818 F.3d 493 (9th Cir. 2016)...........................................................................................................17, 18

*Cmty. House, Inc. v. City of Boise,* 490 F.3d 1041 (9th Cir. 2007) ..........................17

*Gamble v. City of Escondido,* 104 F.3d 300 (9th Cir. 1997) .....................................22

*Gov't. of Guam ex rel. Guam Econ. Dev. Auth. v. United States,* 179 F.3d 630 (9th Cir. 1999).................................................................6, 14

*Knappenberger v. City of Phoenix,* 566 F.3d 936 (9th Cir. 2009) ...............................9

*Morton v. Mancari,* 417 U.S. 535 (1974) ............................................................10, 13

*Navarro v. Block,* 72 F.3d 712 (9th Cir. 1995)......................................................18, 22

*Pac. Shores Props., LLC v. City of Newport Beach,* 730 F.3d 1142 (9th Cir. 2013).................................................................................................17-18

*Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256 (1979) ..........................18, 20

*Peyote Way Church of God, Inc. v. Thornburgh,* 922 F.2d 1210 (5th Cir. 1991) .....................14

*Pit River Tribe v. Bureau of Land Mgmt.,* 793 F.3d 1147 (9th Cir. 2015) ...................................9

*Ramsey v. Chaco,* 549 F.2d 1335 (9th Cir. 1977).......................................................16

*Rice v. Cayetano,* 528 U.S. 495 (2000) ..............................................11, 13, 17, 19

*Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205 (1972)...........................................24

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252 (1977)....................................................................................................18, 20

ii

*Wabol v. Villacrusis,* 958, F.2d 1450 (9th Cir. 1990)............................................13, 21

*Washington v. Yakima Indian Nation,* 439 U.S. 463 (1979) ....................................14

**Territorial Cases**

*Angel Santos and The Chamorro Nation v. Joseph F. Ada, Governor of Guam,*
   Guam Superior Court Case No. SP0083-92 ..............................................8

## STATUTES

**Federal Statues**

8 U.S.C. § 1407(b) ....................................................................................8

42 U.S.C. § 3601....................................................................................1, 24

48 U.S.C.:
   § 1421 ................................................................................................2
   § 1421f(b) ..........................................................................................5
   § 1423i ..............................................................................................16
   § 1424i ................................................................................................8

The Civil Liberties Act of 1988 (Pub. L. 100-383, Title I, Aug. 10, 1988, 102
   Stat. 904, 50a U.S.C. § 1989b) ........................................................21

Guam Excess Lands Act (Pub. L. 103-339) ..........................................9, 23

Guam Organic Act (1950)
   § 28(b)....................................................................................5, 14, 15
   Ch. 512, Section 19, 64 Stat. 389 ......................................................16

*Hawaiian Homes Comm'n Act,* 1920, Act of Jul. 9, 1921 (HHCA), Pub. L. 67-
   34, 42 Stat. 108, reprinted in 1 HRS 261 (2009) ..................................7

 Immigration and Nationality Act of 1952....................................................8

Land Transfer Act (Pub. L. 225, 79th Congress; approved Nov. 15, 1945),
   59 Stat. 584 (1945)..........................................................................3, 14

**Naval Government of Guam Statutes**

Civil Code of Guam, Div. Second §§ 671-72 (1947) ..............................20

**Territorial Statutes**

21 Guam Code Ann. Ch. 75:
    § 75101(d)....................................................................................................1, 17
    § 75107(a)....................................................................................................1
    § 75112........................................................................................................9

Guam Pub. L. 12-226 § 13500(d)..............................................................8

Guam Pub. L. 15-118..................................................................................8

Guam Pub. L. 33 Section 40, codified as Guam Gov't. Code 13509
    (repealed 1975) ...............................................................................5, 6, 15, 16

## OTHER AUTHORITIES

Baicker-McKee *et al., Federal Civil Rules Handbook,* 2018...................................9, 10

Exec. Order 310 (Apr. 21, 1919) ...............................................................20

Exec. Order 9981 (Jul. 26, 1948)...............................................................21

Exec. Order 10077 (Sep. 7, 1949) .............................................................15

Exec. Order 10178 (Oct. 30, 1950).............................................................5

*Issues in Guam's Political Development: The Chamorro Perspective,* published by
    the Political Status Coordinating Commission, 1996 ...............................21

Treaty Concerning Cession of Russian Possessions in North America, Mar. 30,
    1867, U.S.-Russ., 15 Stat. 539 ...........................................................12

Treaty of Paris, Dec. 10, 1898, U.S.-Spain.............................................1, 12

## LEGISLATIVE HISTORY

Hearings before the Comm'n on Naval Affairs Re S.1139,
    Jun. 26, 1945 ......................................................................................3

Rep. of the Comm.on Res., Dev. and Agric. on Bill No.
    715 ............................................................................................7, 19

Res. No. 131, Eleventh Guam Legislature (1971) ....................................6

iv

S. Rep. 2109, 1950 U.S. Code & Admin. Rep. p. 2841 ...........................................................13

S. Rep. to Accompany S.1362, Comm. on Naval Affairs, Sep. 26,
    1945, Rep. No. 596).........................................................................................................2

S. Rep. to Accompany S.2246, Comm. on Naval Affairs, Rep. No.
    1397, May 29, 1946 ..........................................................................................................3

United States Congress, Official Transcription, Third day of Public Hearings,
    Nov. 23, 1949.....................................................................................................................4

Transcript of 32nd Regular Session, House of Assembly, Ninth Guam Congress,
    Dec. 10, 1949...................................................................................................................21

Statement of Leslie M. Turner, Assistant Sec'y. of the Interior for Territorial and Int'l Affairs,
    S. Rep. 103-293 (Jun. 24, 1994) .....................................................................................22

## REPORTS

*Hopkins Comm. Rep. for the Sec'y on the Civil Gov'ts of Guam
    and American Samoa* ................................................................................................2, 3, 5

*Rep. to United Nations on Guam, American Samoa and Other Island
    Possessions Administered by the Navy Dep't*, OPNAV- P22-100,
    Jul. 1946...........................................................................................................................20

## SECONDARY SOURCES

Anthony F. Quan, *"Respeta I Taotao": The Recognition and Establishment of
    the Self-Determination and Sovereign Rights of the Indigenous Chamorros of
    Guam Under International, Federal and Local Law,* 3 Asian-Pac L. & Pol'y J.
    (2002)...............................................................................................................................10

Arnold H. Leibowitz, *The Applicability of Federal Law to Guam,* 16 Va. J. Int'l
    L. 21, 59 (1975-1976) .......................................................................................................7

Carano and Sanchez, *History of Guam,* 1964 .....................................................................2, 4

Comr. E.E. Galahue, *Land Tenure in the Marianas*, School of Naval Administration, Stanford
    University (1946).............................................................................................................21

Jon M. Van Dyke, *The Political Status of the Native Hawaiian People,* Yale Law
    & Policy Review: Vol 17: Iss. 1, Article 3 .....................................................................11

Laura Thompson, *Guam and Its People,* First Greenwood Printing, 1969 (1947).......................2

*The Land Question,* Pac. Daily News (Apr. 14, 1974) ...........................................................6, 19

Pat McElroy, *Local Land Law to Right a Wrong,* Pac. Daily News
   (Feb. 7, 1975)............................................................................................................................19

Robert F. Rogers, *Destiny's Landfall: A History of Guam, Revised Edition* ....................2, 5, 21

Robert K. Coote, *Land Use Conditions and Land Problems on Guam* (1951) ...................2, 4, 6

Rose Cuison Villazor, *Problematizing the Protection of Culture and the Insular
   Cases,* 131 HARV. L. REV. Forum 131 (Apr. 2018).........................................................10, 16

United Nations Charter, Chapter XI: *Declaration Regarding Non-Self-Governing
   Territories,* Article 73 ..............................................................................................................13

W. Scott Barrett and Walter S. Ferenz, *Martial Law in Guam,*
   CALIF. L. REV. Vol. 48:1 (1960) .......................................................................................1, 20

**MISCELLANEOUS**

Conformed copy of *Letter from C. A. Pownall to the Guam Congress* (Jun. 28, 1948) on file with
the Nieves M. Flores Memorial Library, Hagatna, Guam ........................................................4

*Guam Dep't. of Land Mgmt.* Instrument
   No. 025219 (Mar. 30, 1953) .................................................................................................6, 15

U.S. Naval Gov't of Guam, M.I., Land Claims Commission, Drawing A106, *Land Reserved for
Guamanian Use* (Number 2 of a Series), Mar. 1947 on file with the Micronesian Area Research
Center, University of Guam, Mangilao, GU................................................................................5

vi

COME NOW, Defendants GOVERNMENT OF GUAM and the ADMINISTRATIVE DIRECTOR OF THE CHAMORRO LAND TRUST, by and through the Attorney General of Guam, and submit the following opposition to the United States' Motion for Partial Judgment on the Pleadings.

## I. INTRODUCTION

The United States sues the Government of Guam, Chamorro Land Trust Commission (CLTC) and the Administrative Director of the Chamorro Land Trust under the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. The United States claims the defendants discriminated on the basis of race in issuing residential leases of government land exclusively to "Native Chamorros" as that term is defined in the Chamorro Land Trust Act (CLTA), 21 GUAM CODE ANN., ch. 75. Under the CLTA, "Native Chamorro" means "any person who became a U.S. citizen by virtue of the authority and enactment of the Organic Act of Guam or descendants of such person." 21 GUAM CODE ANN. § 75101(d). Under 21 GUAM CODE ANN. § 75107(a), the CLTC is authorized to lease "Chamorro homelands" to "native Chamorros."

The United States has moved for partial judgment on the pleadings declaring the CLTA and its regulations invalid to the extent they require or permit any action that would be a discriminatory housing practice under the Fair Housing Act (FHA). However, the CLTA does not discriminate on the basis of race, but is an act designed to correct an injustice caused by the wholesale taking of Guam land by the United States Military between 1898 and 1950.

## II. STATEMENT OF FACTS

The United States gained control of Guam after the Spanish-American War of 1898. Treaty of Paris, Dec. 10, 1898, U.S.-Spain, attached as Exhibit 1. From 1898 until 1950, the U.S.

held the Island as an instrumentality of the U.S. Navy. In 1950 the administration of Guam was turned over to the Department of the Interior and Guam's Organic Act establishing a civilian government went into effect. 48 U.S.C. § 1421, *et seq*. It is estimated that federal land holdings on Guam was about one fourth of the island when the Navy assumed control in 1899. LAURA THOMPSON, *Guam and Its People*, 115, First Greenwood Printing, 1969 (1947) [hereinafter THOMPSON] attached as Exh. 2. The Japanese military invaded the Island on December 8, 1941 and occupied Guam until it was retaken by the United States in July 1944. ROBERT F. ROGERS, *DESTINY'S LANDFALL: A HISTORY OF GUAM*, 170-79 (rev. ed. 2011) [hereinafter ROGERS] attached as Exh. 3. The battle resulted in massive destruction and displacement of Guamanians from their homes and land. THOMPSON, pp. v. and 160; CARANO AND SANCHEZ, *HISTORY OF GUAM*, 310-311 (1964), attached as Exh. 4.

> After the reoccupation of Guam by United States Forces in July 1944, the military establishment rapidly increased many-fold. Installations of all kinds were rushed to completion by all arms of the services. Of necessity, whatever lands were required, both public and private, were taken by the Military subject to future compensation with little regard for ownership.

ROBERT K. COOTE, LAND USE CONDITIONS AND LAND PROBLEMS ON GUAM at 8 (1951) [hereinafter COOTE] attached as Exh. 5. By 1945, there were "over 160 military and naval reservations on Guam." S. Rep. No. 596, 1 (1945) attached as Exh. 6. It was estimated that in 1947, the military was occupying 120 square miles of Guam based on its estimated size of 217 square miles, or about 55% of the island. *Hopkins Comm. Rep. for the Sec'y. on the Civil Gov'ts of Guam and American Samoa*, Section, IIC 2a, 15 [hereinafter HOPKINS Comm. Rep] attached as Exh. 7. "By late 1944, in addition to land taken for U.S. military bases, 1,500 acres of the best farmland on Guam were appropriated to produce crops and animals for military consumption."

ROGERS, p. 198. As noted by United States Senator Millard Tydings at a hearing before the Committee on Naval Affairs in June of 1945:

> "Senator Tydings: The Navy and Army together have taken most of the land already. I do not think they paid some of the natives for it yet.
>
> Captain Gary: No sir; they haven't.
>
> Senator Tydings: I talked with one of these Guam people who is a judge, and he said this operation was wonderful but it disrupted the whole life of the island. He described the life they used to have. He said, "you have taken everything from us. We haven't got any grazing land; we haven't got any agricultural land, you have taken it for the Army and Navy, and we have not even been paid for it….. They are entitled to consideration, because their villages have been absolutely wiped out.

Hearings before the Comm. on Naval Affairs Re S.1139 (Jun. 26, 1945) at 32-33 attached as Exh. 8.

The federal government attempted to deal with the disruption resulting from the Guamanians' loss of land to the military. The Land Transfer Act, Pub. L. 225, 59 Stat. 584 (Nov. 15, 1945), "authoriz[ed] the Secretary of the Navy to transfer land for resettlement in Guam," whereby public lands belonging to the United States which were not required for military use could be designated for the resettlement of Guamanians "who were displaced as a result of the extensive military and naval construction programs." S. Rep. to accompany S. 2246, Comm. on Naval Affairs, Rep. No. 1397, May 29, 1946, 2 attached as Exh. 9. The plan going forward, as sanctioned by Congress, was for the military to take the Guam land it did not need to "set up as a pool from which could be allocated suitable parcels of land for purchase by those citizens of Guam whose land has been acquired by the United States." HOPKINS COMM. REP., Section IIC 3, 19. This plan was never successfully implemented. *Id.*

It was recognized early on that identifying all the landowners or descendants of those

3

people who lost their land to the military would be a monumental task. After World War II, it was "difficult or impossible to identify land ownership. Prewar land records were not of the best. During the war many of these records were lost or destroyed." COOTE, 3. In 1948, Guam Naval Governor C.A. Pownall received a request from the Guam Congress for a complete list of property owners whose land was occupied by the Military.[1] Pownall refused to provide such a list because few of the lands under condemnation had been surveyed. Governor Pownall noted:

> Exact listings of properties affected and a determination of their ownership cannot be completed except as surveys are effected….An estimated sixty percent of the privately-owned lands lying within areas held by the Government are either unregistered or merely provisionally recorded. In these instances title curative steps are required to definitely establish ownership…An even greater percentage of privately-owned land titles are involved in probate proceedings.

Conformed copy of Letter from C. A. Pownall to the Guam Congress (June 28, 1948) on file with the Nieves M. Flores Memorial Library, Hagatna, Guam attached as Exh. 10.[2] Pownall noted that "any listing of properties would be subject to variation and inaccuracies" and concluded that "it is neither practical or desirable to prepare the detailed compilation requested" by the Guam Congress. *Id.*

The difficulties in sorting out ownership of the property taken by the Navy is further demonstrated by the Navy's efforts to condemn land for the establishment of a park in Agana. Seventy-three families were said to own the condemned land which consisted of ninety individual parcels of private property. Subcomm. on Public Lands from the House of Representatives of the United States Congress, Official Transcription, Third day of Public Hearings, Nov. 23, 1949, 130-31 attached as Exh 11.

---

[1] In 1948, the Guam Congress consisted of a House of Council and a House of Assembly. Members were elected by the people. The governor had veto power, but his veto could be overridden by a two-thirds vote in each of the two houses of Congress. If a veto was overridden, it was submitted to the Secretary of the Navy for final action. CARANO AND SANCHEZ, *History of Guam*, 347.

[2] Naval Governor Pownall blamed Guamanians for the Navy's inability to identify whose land it had taken. Pownall claimed "[t]hese difficulties exist as a result of failure on the part of Guamanians during past years to register the title to lands owned by them or to probate the estates of deceased persons through whom ownership is derived." C. A. Pownall, letter to the Guam Congress, Jun. 28, 1948.

4

During this time period, the Navy's control of Guam was subject to media scrutiny in the mainland. ROGERS, 196. In 1947, the Hopkins Committee established by Defense Secretary James Forrestal, published its report which was critical of the Navy's efforts to solve Guam's land problem. *See* HOPKINS COMM. REP., Section IIC 3, pp. 5-6, 15, 18, 19. At the time of the submission of the 1947 Hopkins Committee Report, no land had been conveyed to Guamanians under the Land Transfer Act and "[p]ersons who have been dispossessed of their homes and land by military forces have yet to receive any land comparable or otherwise in return." HOPKINS COMM. REP., Section IIC 3, p. 19. A March 1947 Navy map sets forth how little land had been reserved for Guamanians at that time. See Exh. 26.

A decision was made by the federal government to place the burden of dealing with Guam's land problem on the local government of Guam. In Section 28(b) of Guam's Organic Act enacted in 1950, Congress delegated broad authority to the Guam Legislature to legislate with respect to real property to be transferred from the federal government to Guam "in such manner as it may deem desirable". (Codified at 48 U.S.C. § 1421f(b)). In 1952, the United States Department of Interior transferred title of all public domain lands on Guam under its jurisdiction to the Government of Guam.[3] In recognition that goals of the federal resettlement program of Guamanians had not been met, the document conveying the property notes that:

> "the objectives of the Guam rehabilitation and [. . .] resettlement program may best be realized by placing administrative responsibility for the implementation of this program in the government of Guam, to be carried out in accordance with the priorities established in section 40 of Public Law 33 of the First Guam Congress."

---

[3] It had been anticipated that this land transfer would occur in 1950. Section 28(b) of the Organic Act required all property not otherwise reserved within ninety days after the act went into effect, to be transferred to the new civilian government. "Section 33 of the act gave the U.S. president the extraordinary authority to designate any part of Guam a military reservation, even if privately owned." ROGERS, p. 212. A quitclaim deed was signed the day before the Organic Act went into effect, whereby the Naval Government of Guam transferred all condemned property to the United States "for its own use." ROGERS, p. 212. President Truman then issued Executive Order 10178 in October 1950, which returned all of the property in the quitclaim deed to the Navy. *Id.* "This left the navy and air force in direct control of over 36 percent of the island. In short Guamanians believed, with considerable justification, that they were fleeced of huge portions of their island." *Id.*

5

Guam Dep't of Land Management Instrument No. 025219 (March 30, 1953) attached as Exh,

12.  Guam Public Law 33, section 40 established priorities with respect to the sale or lease of

Government real property for residential or agricultural purposes.  (Guam Pub. L. 33, Section 40

was codified as GUAM GOVERNMENT CODE 13509 (repealed 1975) attached as Exh. 13).  The

first priority was to Guamanians who had lost all their land to the Navy or government of Guam

and the second priority was to Guamanians who had lost a substantial portion of their land to the

Navy or government of Guam.

Despite, the passage of Guam Public Law 33, and the federal government's placement

of the burden upon the local government to remedy Guam's land problem, Guamanians still

looked to the federal government to return land to Guamanians.[4]  As of 1950, the military held

approximately 49,128 acres or 34% of Guam.  COOTE at 5.  On June 25, 1971, the Guam

Legislature adopted Resolution No. 131, petitioning the Federal Property Review Board to

examine the extent of Federal landholdings on Guam "with a view toward making most efficient

use of such holdings, and releasing to the people of Guam any land not needed for Federal

purposes…" *Res. 131*, 11th Guam Leg. (1971) attached as Exh. 14.  However, Congress did

nothing.

On April 14, 1974, Guam's newspaper, the Pacific Daily News, in an editorial entitled

"The Land Question", noted "if there has been any deep rooted local antagonism against the

military it came about during the sometimes hectic days immediately following the war, when

the Pentagon, realizing the importance of Guam in the future of the Pacific, bought up a great

deal of the island land from the Guamanian people."  *The Land Question*, PAC. DAILY NEWS

(Apr.14, 1974) attached as Exh. 15. The editorial went on to congratulate Guam's U.S.

---

[4] By 1950 the military was no longer using much of the land it had taken; more than 50% of the actual acreage in
Guam was occupied by inactive military installations. *Gov't of Guam ex rel. Guam Econ. Dev. Auth. v. United
States*, 179 F.3d 630, 639 (9th Cir. 1999).

6

Congressman Antonio Won Pat on his efforts to pass legislation that would grant successful claimants a choice between just compensation for the land taken from them, or an exchange for surplus U.S. government land of equivalent value. However, the proposed legislation was not enacted.

In 1975, Professor Arnold Leibowitz summed up the failure of the federal government to rectify the injustice resulting from its taking of Guam land:

> "Various bills have been introduced in Congress in an attempt to rectify the inequities of the post-war land taking, but the Department of Justice and of the Navy have consistently opposed these measures."

Arnold H. Leibowitz, The Applicability of Federal Law to Guam, 16 Va. J. Int'l L. 21, 59 (1975-1976). It was at this moment of the federal government's prolonged failure to act, that, in 1975, the Chamorro Land Trust Act was passed by the Guam Legislature. The legislative committee's report recommending passage of the act states in the "purpose" section:

> The Legislature finds and declares that the strong ties of the family group to its ancestral lands has been of fundamental significance to our island culture. Through the land the family grew and generated income to meet its needs. These ties have been frayed and broken since 1898. *The Government of Guam recognizes its special obligation to descendants of those persons who enjoyed peaceful ownership of their island lands prior to the catastrophic entry of the Federal presence with its confiscatory appetite for our land. This legislation attempts to in part cure their injustices.*

(emphasis added). Rep. of the Comm. on Res., Dev. and Agric. on Bill No. 715 attached as Exh. 16.

The CLTA, which was patterned after the Hawaiian Homes Commission Act, Jul. 9, 1921 (HHCA), Pub. L. 67–34, 42 Stat. 108, reprinted in 1 HRS 261 (2009), provides "qualified applicants" with the opportunity to lease, for $1 per year, government land for residential or farming use. As originally enacted "qualified applicants" must be "native

Chamorros"—defined as "any person who the [Chamorro Land Trust] commission determines to be of at least one-fourth part of the blood of any person who inhabited the island prior to 1898." Guam Pub. L. 12-226 § 13500(d).

On March 31, 1980, the definition of "native Chamorro" under the act was amended through Guam Public Law 15-118. Native Chamorro is now defined as "any person who became a United States citizen by virtue of the authority and enactment of the Organic Act of Guam or his or her descendants." Guam's Organic Act generally conferred U.S. citizenship to all persons born on the island of Guam on or after April 11, 1899, regardless of whether they were born before or after August 1, 1950, the effective date of the act. 8 U.S.C. § 1407 (b).[5]

After its enactment, the CLTA was not implemented for many years. In 1992, an indigenous rights group sued the governor of Guam seeking an order requiring implementation of the act. *Angel Santos and The Chamorro Nation v. Joseph F. Ada, Governor of Guam*, Guam Superior Court Case No. SP-0083-92. On February 10, 1993, the Guam Superior Court issued a decision and order upholding the validity of the CLTA and ordering its implementation. *Angel Santos and The Chamorro Nation v. Joseph F. Ada, Governor of Guam*, Guam Superior Court Case No. SP-0083-92 (Dec. and Order, Feb. 10, 1993).

On December 2, 1995, the Chamorro Land Trust Commission began accepting applications for residential and agricultural leases. While eligibility for CLTA leases is limited to Organic Act citizens, there is no restriction on who can live on the leased properties. In its complaint, the United States admits an African-American man lived on CLT property until his leaseholder wife died. ECF 1, p. 9. The CLTC has been issuing leases since the 1990s.

Other provisions of the CLTA have never been implemented and there are no plans to do

---

[5] The Organic Act's citizenship provision was originally contained in 48 U.S.C. § 1424i. Repealed by Act of June 27, 1952, c. 477 Title IV, Section 403(a)(42), 66 Stat. 280. This section with minor changes, was reenacted as part of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1407.

8

so. These unimplemented provisions include the Chamorro Home Loan Fund, and other funds authorized by 21 GUAM CODE ANN. § 75112. Decl. of Michael Borja attached as Exh. 17.

### III. ISSUES

**A. Whether Plaintiff's motion for judgment on the pleadings should be denied because the CLTA is authorized by federal law, does not discriminate on the basis of race and is rationally tied to the fulfillment of the United States' obligation to the indigenous people of Guam?**

**B. Whether Plaintiff's motion for judgment on the pleadings should be denied because it cannot show as a matter of law that an invidious discriminatory purpose was a motivating factor behind the CLTA?**

**C. Whether Congress approved the CLTA through the enactment of the Guam Excess Lands Act (Public Law 103-339) in 1994?**

### IV. DISCUSSION

*Legal standard for Motions for Judgment on the Pleadings*

Judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 939 (9th Cir. 2009).

> "The Courts have articulated different tests for deciding Rule 12(c) motions, depending on the motion's purpose. When the motion seeks a merits disposition of the dispute, the test tracks the summary judgment inquiry and asks whether – in light of the pleadings averments and responses – a material factual dispute exists or whether the movant is entitled to judgment as a matter of law. Unlike summary judgment motions, however, this type of Rule 12(c) motion considers only the face of the pleadings and   a few other modest categories of extrinsic materials.

BAICKER-MCKEE ET AL., FEDERAL CIVIL RULES HANDBOOK, 2018, p. 470. *See also Pit River Tribe v. Bureau of Land Mgmt.* 793 F.3d 1147, 1158 (9th Cir. 2015) (Genuine issue of material fact precluded judgment on pleadings in tribe's action against federal government.)

"Because the motion represents a challenge at an embryonic stage in the litigation, the

court will construe the pleadings liberally and will not resolve contested facts. Instead, the court will accept all well-pleaded material allegations of the nonmoving party as true and view all facts and inferences in a light most favorable to the pleader." BAICKER-MCKEE, *supra*, p. 470.

**A. The CLTA does not discriminate on the basis of race in violation of the FHA because the act is authorized by federal law and is rationally tied to the fulfillment of the United States' obligation to the indigenous people of Guam**

The CLTA does not violate the FHA because limiting eligibility under the CLTA to "native Chamorros" has a political purpose, not a racially discriminatory one. Chamorros share a special trust relationship with the federal government which is analogous to the federal government's relationship with American Indians. *See* Anthony (T. J.) F. Quan, Comment, *"Respeta I Tao Tao": The Recognition and Establishment of the Self-Determination and Sovereign Rights of the Indigenous Chamorros of Guam Under International, Federal and Local Law*, 3 Asian-Pac. L. & Pol'y J. 81-108 (2002). Preferential programs for American Indian tribes have been viewed as "political" rather than "racial classifications." Rose Cuison Villazor, *Problematizing the Protection of Culture and the Insular Cases*, 131 HARV. L. REV. FORUM 131 (Apr. 2018). The definition of "Native Chamorro" is a "political" not racial classification. *Chamorros share a special trust relationship with the federal government*

In *Morton v. Mancari*, 417 U.S. 535 (1974) non-Indians challenged an employment preference for Indians on the ground that it discriminated "on the basis of race." 417 U.S. at 540. The Supreme Court disagreed, grounding its decision on "[t]he plenary power of Congress to deal with the special problems of Indians" and "the assumption of a 'guardian-ward' status." *Id.* at 551-552. Viewed in this "historical and legal context," the challenged preference was based on the "unique legal" and "political" status of American Indians, not race. *Id.* at 551, 553-554 &

n.24. As a result, the Indian employment preference triggered only rational-basis review. *Id*. "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id*. at 555. As one scholar noted:

> It is important to note that the *Mancari* preference was not free of racial overtones, because, as the Court observed, an individual did have to have "one-fourth or more degree Indian blood" to qualify for the preference. Although this racial criterion was necessary, it was not sufficient, because the individual also had to be a member of a federally recognized tribe to qualify for this particular statutory preference.
>
> The Court thus recognized that it was dealing with a mixed political/racial category, but it nonetheless concluded without hesitation that the "rational basis" level of judicial review should apply, because the prominent feature of this category was the political relationship between the native people and the United States Government. The Court then concluded that the statute easily satisfied the rational basis level of judicial review because the statute was rationally related to the goal of promoting self-governance for the Indians.

Jon M. Van Dyke, *The Political Status of the Native Hawaiian People*, Yale L. & Pol' Rev.: Vol. 17: Iss. 1, Art. 3, 114 (1998).

In *Rice v. Cayetano*, 528 U.S. 495, 518-19 (2000), the Supreme Court left open the question of whether Congress may treat Native Hawaiians, and by implication other indigenous people such as Chamorros, as it does American Indian tribes. In this litigation, the United States asserts it has no special relationship with Chamorros,[6] which is stunning given that the United States in its *amicus* brief submitted in *Rice v. Cayetano*, 528 U.S. 495 (2000) admitted it "has a special responsibility for the welfare of the Native peoples of the United States, including Native Hawaiians." Brief for the United States as *Amicus Curiae* Supporting Respondent, p.8. *Rice v. Cayetano*, 528 U.S. 495 (2000). In this litigation, the United States appears to argue that this special responsibility extends to native peoples of the United States except Chamorros living on

---

[6] *See* ECF 34, at p. 28, ll. 7-9.

Guam. *See* ECF 1, 5-6, ¶¶ 24-25. The United States seeks to relegate Chamorros to second-class status among the nation's indigenous people.

The United States does have a trust relationship with the Chamorro people. This special relationship originates in the Treaty of Paris of 1898, which provides that the "political and civil rights of the native inhabitants [of Guam] will be determined by Congress." Treaty of Paris, Dec. 10, 1898, U.S.-Spain Attached as Exh. 1. Similar language in the treaty by which the United States acquired Alaska has been held to create a trust relationship between the United States and Alaska's indigenous people. *Alaska Chapter, Associated Gen. Contractors of America v. Pierce*, 694 F.2d 1162, 1169 n. 10 (9th Cir. 1982). The 1867 Treaty of Cession with Russia provides that "[t]he uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to the aboriginal tribes of that country." Treaty Concerning Cession of Russian Possessions in North America, Mar. 30, 1867, U.S. Russ., 15 Stat. 539. "It is now established that through this treaty the Alaskan Natives are under the guardianship of the federal government and entitled to the benefits of the special relationship." *Alaska Chapter, Associated Gen. Contractors of America v. Pierce*, 694 F.2d 1169 n. 10; VAN DYKE, *supra* at 118-19.

It does not matter that Chamorros have never been recognized as an Indian Tribe and have never signed treaties with the United States. Alaskan Natives have not historically been organized into reservations or into tribal units. Nor have Alaskan Natives ever entered into treaties with the United States designating reservation lands which Natives were entitled to occupy. *Alaska Chapter, Associated Gen. Contractors of America v. Pierce*, 694 F.2d 1169 n. 10.

12

This trust relationship also exists through the United Nations Treaty signed by the United States. U. N. CHARTER 59 Stat. 1031 (1945). Guam is listed as a non-self -governing territory by the United Nations General Assembly. Under the United Nations Charter, Chapter XI: Declaration Regarding Non-Self-Governing Territories, Article 73, the United States is required to

> "recognize the principle that the interests of the inhabitants of these territories are paramount, and accept as a sacred trust the obligation to promote to the utmost, within the system of international peace and security established by the present Charter, the well-being of the inhabitants of these territories, and, to this end:
>> a. to ensure, with due respect for the culture of the peoples concerned, their political, economic, social, and educational advancement, their just treatment, and their protection against abuses…

In the legislative history of Guam's Organic Act, Congress recognized its special responsibility to Guam's people.

> "In addition to the obligation under the Treaty of Paris, the United States has additional treaty obligations with respect to Guam as a non-self-governing Territory. Under Chapter XI of the Charter of the United Nations, ratified by the Senate June 26, 1945 (59 Stat. at p. 1048), we undertook, with respect to the people of such Territories, to insure political advancement, to develop self-government, and taking "due account of the political aspirations of the peoples;. . . to assist them in the progressive development of their free political institutions . . . ."

S. Rep. 2109, 1950 U.S. Code & Admin. Rep. p. 2841 attached as Exh. 18.

Congress and the federal government have a trust relationship with Chamorros just as they do with American Indians, Native Alaskans, native Hawaiians, and Chamorros in the Commonwealth of the Northern Marianas.[7] There is no "Guam Chamorro exception" to the federal government's special relationship with the indigenous people of the United States.

---

[7] *Morton v. Mancari*, *supra*, (American Indians) *Alaska Chapter, Associated General Contractors of America v. Pierce*, *supra* (Native Alaskans); *Rice v. Cayetano*, 146 F.3d 1075 (9th Cir, 1998) rev.d other grounds *Rice v. Cayetano*, 528 U.S. 495 (2000) (Native Hawaiians) and *Wabol v. Villacrusis*, 958 F.2d 1450, 1452 (9th Cir. 1990) (Chamorros and Carolinians in the Commonwealth of the Northern Marianas)

13

*The United States has delegated authority to Guam to administer its trust responsibility to rectify the taking of land from Guamanians*

As a general matter, the "States do not enjoy [the] same unique relationship with Indians" as the federal government. *Washington v. Yakima Indian Nation*, 439 U.S. 463, 501 (1979). When Congress delegates authority to a State to administer the federal trust responsibility to indigenous people, however, state legislation that is within the scope of that authority is subject to the same constitutional analysis as legislation enacted by Congress itself. *Yakima Indian Nation*, 439 U.S. 501. This delegation or authorization can be implicit. *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1218-19 (5th Cir. 1991). Guam acted under such a delegation of authority in enacting the CLTA.

Congress recognized its obligation to rectify its taking of land from Guamanians through the enactment of The Land Transfer Act, (Pub. L. 225, 79th Congress; approved Nov. 15, 1945). This public law authorized the Secretary of the Navy to "transfer to the naval government of Guam, for sale or transfer by the naval government of Guam" to residents of Guam in replacement of lands taken by the military.

In the early 1950s, Congress made the first of several delegations to the Government of Guam of its trust responsibility over Guam land issues. Section 28(b) of Guam's Organic Act requires that lands transferred to Guam under the section "be administered for the benefit of the people of Guam, and the legislature shall have authority, subject to such limitations as may be imposed upon its acts by this Act or subsequent Act of the Congress, to legislate with respect to such property, real and personal, in such manner as it may deem desirable." [8]

---

[8] Plaintiff misstates the holding of *Gov't of Guam ex rel. Guam Econ. Dev. Auth.*, 179 F.3d at 640, wherein it claims "the Ninth Circuit made clear…that Congress has not authorized Guam to assert land rights on behalf of its native inhabitants." The land at issue in the case was federal land, not Government of Guam land, and it was upon this distinction the Ninth Circuit based its ruling. 179 F.3d at 640 ("[T]he Organic Act delegates authority over the property at issue to the executive branch of the federal government, not the territorial government of Guam. To the extent that Congress intended to delegate its trust authority over aboriginal rights to that land, Congress did not delegate its authority to the territorial government of Guam.")

14

With the end of the Naval Government of Guam in 1949 through President Truman's executive order transferring the administration of Guam to the Department of Interior, and subsequent enactment of the Organic Act in 1950, the Land Transfer Act was obsolete. *See* Exec. Order 10077 (Sep. 7, 1949) attached as Exh. 19. There was no longer a Naval Government of Guam to transfer property to Guamanians for resettlement under the Land Transfer Act. Section 28(b) of Guam's Organic Act was intended to authorize the Government of Guam to transfer property for resettlement to Guamanians who had lost their lands to the federal government.

Consistent with this delegation, in 1952, the United States Department of Interior transferred title of all public domain lands on Guam under its jurisdiction to the Government of Guam. In recognition that goals of the federal resettlement program of Guamanians had not been met, the document conveying the property notes that:[9]

> "the objectives of the Guam rehabilitation and […] resettlement program may best be realized by placing administrative responsibility for the implementation of this program in the government of Guam, to be carried out in accordance with the priorities established in section 40 of Public Law 33 of the First Guam Congress.

Guam Dep't of Land Management Instrument No. 025219 (Mar. 30, 1953). Guam Public Law 33, section 40 directs that the following priorities shall be observed with respect to the sale or lease of Government real property for residential or agricultural purposes[10]:

> "First, persons who have had all of their land acquired by the United States, the Naval government of Guam, or the government of Guam, and who have owned no other land since January 1, 1946;
> "Second, persons who have had a substantial portion of their land acquired by the United States, the Naval government of Guam, or the government of Guam, since July 1, 1944, the remaining portion whose land is not adequate or sufficient for reasonable agricultural or residential purposes."

---

[9] As recently as 1988, the Office of the Territorial and International Affairs of the Interior Department (OTIA) made a proposal before the Subcommittee on Insular and International Affairs on H.R. 2601 to transfer some federal land on Guam into a "land bank" in which all of the claimants to federally owned land on Guam would have an interest. H. R. No. 103-391(I) (Nov. 20, 1993).

[10] Guam Public Law 33 was formerly codified as GUAM GOV'T CODE, ch. VI, § 13500 ff.

GUAM GOVERNMENT CODE 13509 (repealed 1975).[11]

Prior to amendment in 1968, Guam's Organic Act provided that all laws enacted by the Guam Legislature ultimately would be reported to Congress, and unless Congress acted to annul the law within one year, it was deemed to have congressional approval. Guam Organic Act § 19, Ch. 512, s 19, 64 Stat. 389 (1950), as amended 48 U.S.C. § 1423i. Failure by Congress to annul Public Law 33, Section 40 within one year constitutes Congressional approval of the Guam law under former Section 19 of the Organic Act. *Ramsey v. Chaco*, 549 F.2d 1335, 1338 (9th Cir. 1977). Congressional approval of Public Law 33, Section 40 is a second delegation of authority to Guam to administer the federal trust responsibility to remedy the problems caused by the federal taking of Guamanian lands.[12]

Plaintiff's motion for judgment on the pleadings should be denied. The CLTA is authorized by federal law and is rationally tied to the fulfillment of the United States' obligation to indigenous people of Guam. The CLTA does not discriminate on the basis of race. "Native Chamorro" is a "political" not "racial" classification.

> "[T]he CLTA was designed to address the impact of colonization on the property rights of Chamorro people and the need to preserve what little lands are left for them in Guam. Ensuring that indigenous peoples have land assists them in determining for themselves their economic, cultural, and political development. Ownership of land is thus better understood to be not only about the protection of culture but a broader argument for indigenous peoples' right to self-determination.

Rose Cuison Villazor, *supra*, p. 150.

---

[11] The origins of this statue appear to predate the Organic Act. See Ninth Guam Cong., appendix, October 8, 1949, pp. 5-8.

[12] Pursuant to *Ramsey v. Chaco*, a third delegation occurred when Congress failed to annul Gov't Code of Guam, Chapter 6, Sections 13500-13527 (1952) requiring The Land Transfer Board to return lands confiscated by the Federal Government to original owners or their heirs. Additionally, the Legislature authorized the Land Transfer Board to provide land to non-landowners (those who the Federal Government evicted from the land previously occupied by the non-landowner). P.L. 88, 1st G. L., 1952. (Original citation). The CLTA is within the authority previously delegated by Congress.

16

Limiting land trust leases to "Native Chamorros" does not violate the FHA.

**B. Plaintiff's motion for judgment on the pleadings should be denied because it cannot show as a matter of law that an "invidious discriminatory purpose was a motivating factor" behind the CLTA**

The United States makes a disparate treatment claim under the FHA. Disparate treatment consists of intentional discrimination. *Avenue 6E Investments, LLC v. City of Yuma*, Ariz., 818 F.3d 493, 502 (9th Cir. 2016). The CLTA is not a facially discriminatory statute. A facially discriminatory statute is one which *on its face* applies less favorably to a protected group. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007). "Native Chamorros" under the act is not a race based definition, but instead is defined as "those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Organic Act of Guam and descendants of those persons." 21 GUAM CODE ANN. § 75101(d). It does not preclude non-Chamorros from leasing land, nor does it provide that all Chamorro people are eligible to lease land. Rather, it is a temporal classification turning only on whether a person gained his or her U.S. citizenship through the operation of Guam's Organic Act. Indeed, Chamorros, including Chamorros born on Guam, who cannot trace their citizenship to the Organic Act have been denied leases on this basis. Decl. of Michael Borja. Nothing about the classification makes race a necessary or even pertinent factor.

"Native Chamorros" eligible for leases under the CLTA can be characterized in terms of many different races. As noted by Justice Stevens in his dissent in *Rice v. Cayetano*, 528 U.S. 495, 539 (2000):

> The distinction between ancestry and race is more than simply one of plain language. The ability to trace one's ancestry to a particular progenitor at a single distant point in time may convey no information about one's own apparent or

17

acknowledged race today. Neither does it of necessity imply one's own identification with a particular race, or the exclusion of any others "on account of race." The terms manifestly carry distinct meaning...

Because the CLTA is not a facially discriminatory statute, this court should "turn to the 'sensitive' multi-factor inquiry articulated by the Supreme Court in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 50 L.Ed.2d 450 (1977)..." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013).

Under *Village of Arlington Heights*, a court analyzes whether the defendant's actions were motivated by a discriminatory purpose by examining (1) statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant "legislative or administrative history." 429 U.S. at 266–68; *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158-59 (9th Cir. 2013); *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015). These are not factors than lend themselves to a motion for judgment on the pleadings. Application of these factors is fact dependent and not a pure question of law. "[A]ny indication of discriminatory motive may suffice to raise a question that can only be resolved by a factfinder". *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir.2013).

In order to prevail, Plaintiff must show an "invidious discriminatory purpose was a motivating factor" behind the challenged statute. *Avenue 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) (citing *Village of Arlington Heights*, 429 U.S. at 266.) "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of

18

consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Navarro v. Block*, 72 F.3d 712, 716 n. 5 (9th Cir. 1995) (quoting *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) (alteration in original)). Acc'd, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The United States presents no evidence to support a claim that the CLTA was enacted due to racial animosity against non-Chamorros. Instead, the historical record overwhelming shows the CLTA was enacted to provide land to those people or their descendants who lost land to the military prior to 1950, particularly the 1944-1950 period when much of the land was taken.

The legislative history and contemporary news articles support the conclusion that the CLTA was remedying problems caused by the Navy's taking of private lands from Guamanians. *See* Rep. of the Comm. on Res., Dev. and Agric. on Bill No. 715. News articles published while the CLTA was being considered confirm the act was to right a wrong committed by the military in taking land from Guam's people. *See* e.g., Pat McElroy, *Local Land Law to Right a Wrong*, PAC. DAILY NEWS (Feb. 7, 1975) attached as Exh. 21; *The Land Question*, PAC. DAILY NEWS (Apr. 14, 1974) attached as Exh. 15.

Nor can the United States show statistics demonstrating a clear pattern unexplainable on grounds other than discriminatory ones. The United States alleges that over 98% of persons made citizens under the Organic Act were Chamorro, while the 2010 census indicates that only 43% of Guam's population identify as all or part Chamorro. ECF 1, p. 4.[13]

The United States argues this demonstrates that the CLTA discriminates against people of other races and ethnic background. But it is not the CLTA that created the alleged statistical

---

[13] Plaintiff's reliance on *Rice v. Cayetano* is misplaced. ECF 34, p. 21. The court stated that "Ancestry *can be* a proxy for race", not that ancestry *is* a proxy of race, 528 U.S. at 514 (Emphasis added.)

19

disparity. It is simply a historical happenstance resulting from the fact that 1) The people who lost their lands to the Military were predominately Chamorro; 2) the policy of the Navy through the 1950s was of excluding non-Guamanians from Guam through its security clearance procedures, W. Scott Barrett and Walter S. Ferenz, *Martial Law in Guam*, CALIF. L. REV. Vol. 48:1 (1960), [14] and 3) the Navy had a policy of prohibiting aliens from owning land. *See* Executive General Order No. 310, April 21, 1919 attached as Exh. 27; *See also* THE CIVIL CODE OF GUAM, Division Second, §§ 671-72 (1947) (generally prohibiting aliens from acquiring title to land on Guam) attached as Exh. 22; and *Rep. to United Nations on Guam, American Samoa and Other Island Possessions Administered by the Navy Department*, OPNAV- P22-100, July 1946, p. 8 (As part of the United States "Guam for Guamanians" policy, no landowner can alienate land to non-Guamanian without approval of the Governor) attached as Exh. 23. [15]

The purpose of the CLTA is to correct an injustice caused by the wholesale taking of Guam land, which was primarily owned by Chamorros, by the United States Military. The United States reliance on statistical disparities regarding the racial background of those eligible for CLTA leases is misplaced. It is explainable on grounds other than discriminatory ones. *See e.g. Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279–80 (1979) (finding no evidence that state intended to discriminate against women by granting lifetime preference to veterans for civil service positions, even though over ninety-eight percent of veterans in state were male); and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 270–71 (finding no evidence that city intended to discriminate against racial minorities by refusing to rezone property from single-family to multiple-family units, even though most minorities can only

---

[14] Civilian access to Guam was severely limited and required a security clearance by the U.S. Navy until President Kennedy ended the security clearance through Executive Order 11045 in 1962. As noted by Rear Admiral W.B. Ammon, commander of the U.S. Naval Forces in the Marianas in 1956, "Navy Policy is to keep Guam for Guamanians, therefore, it does not look with favor on the entry of any foreigner to Guam for the purpose of settling permanently." W. Scott Barrett and Walter S. Ferenz, *Martial Law in Guam*, CALIF. L. REV. Vol. 48:18 (1960).

[15] As early as 1899, the Navy restricted the sale and leasing of any privately owned lands and required express consent of the Naval Governor prior to disposal of any real property. Gen. Order No. 3, Aug. 21, 1899.

20

afford multiple-family units).

The CLTA is not racially discriminatory for the same reasons that the federal law granting reparations to Japanese Americans who had been interned by the United States government during World War II is not racially discriminatory. *See The Civil Liberties Act of 1988* (Pub.L. 100–383, Title I, Aug. 10, 1988, 102 Stat. 904, 50a U.S.C. § 1989b, *et seq.*) Both statutes are intended to remedy a wrong committed by the federal government that primarily affected non-Caucasian people.[16]

Limiting the eligibility under the CLTA to Organic Act citizens or their descendants is a narrowly tailored remedy. Non-Organic Act citizens are excluded from obtaining land trust leases because neither they, nor their ancestors had their lands taken by the United States. Land in the Mariana Islands historically passes from generation to generation and is not sold. *Wabol v. Villacrusis*, 958 F.2d 1461 (9th Cir. 1990). The taking of the people's land by the military did not just deprive the owners of the property at the time of taking, it affected succeeding generations.

> Occupation and ownership of land is one of the most important elements in promoting economic self sufficiency and satisfaction, according to the Chamorro out look. According to custom, stemming from ancestral tradition, land is considered one of the most important elements supporting the family structure. It is handed down from fathers to heirs with a spirit approaching a sacred trust.

---

[16] Throughout the time the Navy was confiscating land from the local people, there was racism against Guamanians. Up to World War II, the Navy operated a segregated school system on Guam. *Issues in Guam's Political Development: The Chamorro Perspective*, published by the Political Status Education Coordinating Comm'n, 1996, pp. 20, 47. "Many government and non-government areas were placed off-limits to Chamorros." *Id.,* 47-48. The late 1940s marked a time when the Navy bid out new construction contracts. The Navy established differential pay scales with fewer benefits which paid Guamanians less than their white counterparts performing the same labor. ROGERS, at p. 200-01. One Navy contractor excluded Guamanians and white people who intermarried with Guamanians from their "club." Transcript of 32nd Regular Session, House of Assembly, Ninth Guam Congress, Dec. 10, 1949, pp. 18-19. Much of this racism against Guamanians occurred during a time when the armed forces were still segregated. "The Navy did not allow enlistment of Chamorros in the regular Navy until the 1930s. But even then, Chamorros could only enlist as mess stewards. This policy applied even to a Chamorro with an American father. Enlistment for duty other than as a mess steward would be denied if his mother was a Chamorro—an echo of the black experience in America." *Issues in Guam's Political Development: The Chamorro Perspective, supra* at 49. It was not until July 26, 1948, that President Truman ordered the desegregation of the armed forces. Exe. Order 9981, Jul. 26, 1948.

21

Comr. E.E. Galahue, *Land Tenure in the Marianas*, School of Naval Administration, Stanford University (1946) attached as Exh. 24. The United States Department of Interior has recognized land "carries great significance for the people of Guam….the people and the land are one. A large part of the Chamorro ancestral values are intertwined with the land." Statement of Leslie M. Turner, Assistant Sec'y of the Interior for Territorial and Int'l Affairs, S. Rep. 103-293 (Jun. 24, 1994) attached as Exh, 25.

Nor is it practical to narrow the class of people eligible for leases to those who lost their land or their descendants. *See infra* at pp. 3-4. Identifying all people or their descendants who lost their land would be a monumental task and would likely result in nearly the same class of people being eligible for leases under the current definition of "Native Chamorro".

The United States argues the Guam Legislature's repeal of "Land for the Landless" program "shed[s] light on whether the challenged law has a discriminatory purpose". ECF 34, pp. 25-26. The CLTA was enacted in 1975, and was implemented pursuant to a 1993 court order. The Land for the Landless program was repealed in 1995. The actions of the 1995 Guam Legislature is not evidence of the legislative intent in passing the CLTA 20 years earlier.

The United States has not established it is entitled to judgment on the pleadings on its disparate treatment claim under the *Arlington Heights* standard. Plaintiff cannot show an "invidious discriminatory purpose was a motivating factor" behind the CLTA. The Plaintiff cannot show the CLTA was enacted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Navarro v. Block*, 72 F.3d 716 n. 5.

The United States has presented no evidence suggesting that correcting an injustice caused by the wholesale taking of Guam land by the United States Military through the

enactment of the CLTA was merely a pretext for discrimination against people who are not racially Chamorro. "Proof of discriminatory motive is crucial to a disparate treatment claim." *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997).

Plaintiff's motion for judgment on the pleadings should be denied.

### C. Congress approved the CLTA through the enactment of the Guam Excess Lands Act (Public Law 103-339) in 1994

Congress approved the CLTA through the enactment of the Guam Excess Lands Act (Pub. L. 103-339) in 1994 and subsequent transfer of some federal land to the Government of Guam. The Guam Excess Lands Act provided for the return of certain lands to the Government of Guam on the proviso that Guam first transmit a "land use plan" to Congress via certain enumerated congressional committees. In September of 1996, Guam submitted its land use plan to Congress which listed the Chamorro Land Trust Act as one of the possible "public benefit uses" envisioned by Public Law 103-339. *See* Letter from Governor Carl T.C. Gutierrez to Congressional Delegate Robert Underwood (Sep. 24, 1996) attached as Exh. 31. A copy of the CLTA was included as part of Guam's land use plan. *See* Gov't of Guam Plan for Local, Pub. Benefit Use of 22 Parcels of Fed. Excess Lands Pursuant to USPL 103-339 "The Guam Excess Lands Act (Sep. 1996) attached as Exh. 32. Under Public Law 103-339 Congress had 180 days after receipt of the land use plan and appraisals from the General Services Agency to disapprove the land use plan. *See* Subsection 3C of Public Law 103-339. The plan was not disapproved and the transfer of excess land occurred.

The United States Congress has plenary power over the territories under the Constitution's Territorial Clause (Article IV, Section 3, Clause 2). Congress' approval of the CLTA overrides any challenge based upon the Fair Housing Act.[17]

---

[17] Congress implicitly and explicitly supports programs such as the Chamorro Land Trust Act. *See* 25 U.S.C. Chapter 43, Sub-chapter VIII Housing Assistance for Native Hawaiians, Section 4223(d) ("nothing in the requirements concerning discrimination on the basis of race shall be construed to prevent the provision of assistance

23

## V. CONCLUSION

Defendants deny they have violated the FHA, deny the term "native Chamorro" in the CLTA is a racial or ethnic term and deny that the CLTA was implemented without authority established by Congress. Material factual disputes exists such that the United States is not entitled to judgment as a matter of law. The CLTA does not discriminate on the basis of race, but is an act designed to correct an injustice caused by the wholesale taking of Guam land by the United States Military between 1898 and 1950.

The FHA declares that "it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. "[T]he purpose of its reach is to replace segregated neighborhoods with 'truly integrated and balanced living patterns.'" Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 FR 11460-01 (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972)).

The CLTA has nothing to do with perpetuating racial discrimination in housing, and has everything to do about rectifying the inequities of the post-war land taking by the United States Military. The United States' motion should be denied.

DATED this 2nd day of October, 2018.

OFFICE OF THE ATTORNEY GENERAL OF GUAM
**Elizabeth Barrett-Anderson**, Attorney General


/S/

_____
**KENNETH ORCUTT**
Deputy Attorney General
Attorneys for Plaintiff Government of Guam

---

under this subchapter"); U.S. Public Law 94-584, Section 5 (1976) (Providing for the establishment of constitutions for the Virgin Islands and Guam.)

24