IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL CASE NO. 17-00113 |
| | ) | |
| Plaintiff, | ) | ORDER DENYING PLAINTIFF'S |
| | ) | MOTION FOR PARTIAL JUDGMENT ON |
| vs. | ) | THE PLEADINGS; ORDER GRANTING |
| | ) | IN PART AND DENYING IN PART |
| GOVERNMENT OF GUAM; | ) | DEFENDANTS' MOTION FOR |
| CHAMORRO LAND TRUST | ) | JUDGMENT ON THE PLEADINGS AND |
| COMMISSION; and | ) | JOINDER THEREIN |
| ADMINISTRATIVE DIRECTOR OF | ) | |
| THE CHAMORRO LAND TRUST | ) | |
| COMMISSION, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE
PLEADINGS; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS AND JOINDER THEREIN**

**I.      INTRODUCTION.**

Whether the Chamorro Land Trust Act violates the Fair
Housing Act is not an issue that this court can decide on the
thin record before it.  This court therefore denies the United
States' motion for partial judgment on the pleadings, ruling that
the United States has failed to meet its burden of showing
entitlement to judgment as a matter of law based on the
allegations in its Complaint and on matters of which the court
may take judicial notice.

There is a second motion for judgment on the pleadings
before this court.  Guam moves for an order limiting the relief
that may be ordered against it even assuming Guam's liability in
this case is established.  This court, agreeing with Guam that

money damages may not be recovered against it in this case, limits any relief to declaratory and injunctive relief, while leaving the question of whether civil penalties may be assessed for further discussion.

## II.        SUMMARY OF RULING.

In its Motion for Partial Judgment on the Pleadings, the United States seeks to stop Guam from continuing what the United States describes as racial discrimination through the implementation of the Chamorro Land Trust Act. Specifically, the United States asserts that the provision of benefits exclusively to "native Chamorro" individuals by the Chamorro Land Trust Commission violates the Fair Housing Act.

Many of the factual allegations are undisputed. During and after World War II, the United States seized land on Guam, mostly from Guam's native inhabitants, the Chamorro people. The United States provided little or no compensation, and the documentation underlying these seizures was sparse or nonexistent. Land was returned to the territory of Guam in 1952; the language returning that land expressly recognized that Guam's inhabitants had had land taken from them and were entitled to consideration of their needs. It was not until decades later that Guam passed the Chamorro Land Trust Act, designed to provide leases of land to people who became United States citizens when

Guam became a United States territory in 1950 via the Organic Act of Guam. These people were mostly Chamorro people.

Guam argues that the factual allegations do not establish that the Chamorro Land Trust is based on a racial classification, as opposed to a political classification. This court agrees with Guam that, at this pleading stage, the court cannot conclude that the Chamorro Land Trust operates as a race-based entity. The record must be further developed to address the question of whether the Chamorro Land Trust operates instead as a compensatory entity that seeks to implement the return to the people of Guam of land that the United States took from them. Possibly, the Chamorro Land Trust includes some land that was not taken by the United States, but, if that is so, that cannot be discerned from the present record. Given the state of the record, this court rejects the United States' contention that the court should now determine as a matter of law that Guam is violating the Fair Housing Act. The matter requires further exploration and an expansion of the record in this case.

Defendants Government of Guam and Administrative Director of the Chamorro Land Trust Commission have their own Motion for Judgment on the Pleadings, ECF No. 35, which argues that the relief sought by the United States is unavailable, although they concede in their Reply brief that this court may award injunctive and declaratory relief. Defendant Chamorro Land

Trust Commission joins in this motion.[1]  *See* ECF No. 38.  The
court grants this motion and joinder in part, ruling that money
damages are not available for the Fair Housing Act claims being
asserted against Guam.  The court denies the remainder of the
motion and joinder.

**III.     BACKGROUND.**

        The history of Guam is fascinating and sometimes
debated by scholars.  This court need not, on the present
motions, resolve those debates.  The court instead sets forth a
brief background only to put this case into context, not to
settle any factual or historical debate.

        There is no dispute that the indigenous people of Guam
are the Chamorros.  *See* Robert F. Rogers, *Destiny's Landfall: A
History of Guam* 6-7 (Univ. of Haw. Press, 1995).  Guam was first
used by Western explorers as a food and water resource in 1521,
when Ferdinand Magellan's three ships arrived on Guam.  In 1564,
a Spanish expedition claimed Guam for Spain.  *See* William L.
Wuerch & Dirk Anthony Ballendorf, *Historical Dictionary of Guam
and Micronesia* 41-42 (The Scarecrow Press, Inc., 1994).

        Hundreds of years later, in the resolution of the
Spanish-American War, Spain ceded Guam to the United States
through Article II of the 1898 Treaty of Paris.  *See* ECF No. 40-

---

[1]The three named Defendants are collectively referred to as
"Guam" in this order.

1,[2] Page 2 of 26 ("Spain cedes to the United States . . . the island of Guam in the Marianas or Landrones.").  This included 41,859 acres of Spanish-owned property, or Spanish Crown lands, constituting approximately one-fourth of Guam.  *See Gov't of Guam ex rel. Guam Econ. Dev. Auth. v. United States*, 179 F.3d 630, 632 (9th Cir. 1999); Laura Thompson, *Guam and its People* (Greenwood Press, 1947), ECF No. 40-1, Page 11 of 26.

With the exception of the period from 1941 through 1944, when Japan occupied Guam, authority over Guam fell under the United States' Department of the Navy pursuant to Executive Order No. 108-A of December 23, 1898.  *See Mailloux v. Mailloux*, 554 F.2d 976, 979 (9th Cir. 1977), *rev'd sub nom. on other grounds Chase Manhattan Bank (Nat. Ass'n) v. S. Acres Dev. Co.*, 434 U.S. 236 (1978); *Gov't of Guam ex rel. Guam Econ. Dev. Auth.*, 179 F.3d at 632; https://www.nps.gov/articles/guamwwii.htm (indicating that Japan invaded Guam in December 1941);

---

[2]In future filings with the court in this action, no more than one exhibit should be included in any CMECF subsection.  Including multiple exhibits in the same CMECF subsection makes it difficult for the court to locate exhibits.  For example, ECF No. 40-1 contains Exhibits 1, 2, and part of 3.  Each of those exhibits should be uploaded separately in the future.  When an exhibit is too large to fit in a single CMECF subsection, it may be broken into smaller parts, such as Exhibits 1a, 1b, etc.  When uploading documents to CMECF, parties must specifically identify the exhibit corresponding to the applicable CMECF subsection.  It would aid the court if a short description of the exhibit itself were also included, if possible.  Examples: ECF No. 40-1 (Exhibit 1-Treaty of Paris); ECF No. 40-2 (Exhibit 2-Thompson, *Guam and its People*).

https://www.nps.gov/wapa/planyourvisit/gaan-point.htm (indicating that the United States retook Guam from Japan in July 1944). During the Japanese occupation of Guam in World War II, Japan freely confiscated property from the people of Guam, usually with no compensation. *See Guam and its People* 160, ECF No. 40-1, Page 12 of 26.

Before the Japanese occupation of Guam, the United States had a relatively small military presence on Guam, consisting almost entirely of a naval station staffed by fewer than 1,000 people. Robert K. Coote, *Land Use Conditions and Land Problems on Guam* 8 (1951), ECF No. 40-2, Page 14 of 20. After the United States retook Guam from the Japanese in 1944, the United States greatly increased its military presence on Guam, taking lands "subject to future compensation with little regard for ownership." *Id.*

On November 15, 1945, Congress passed the Guam Meritorious Claims Act, Public Law 79-224, 59 Stat. 582, authorizing the Secretary of the Navy, for a one-year period, to adjudicate and settle claims against the United States for real and/or personal property damage occurring on Guam during World War II. In 1994, Guam's representative to Congress, Robert A. Underwood, asked Congress to revisit Guam war reparations, characterizing the Guam Meritorious Claims Act as well-intentioned, but unsuccessful. *See*

https://www.gpo.gov/fdsys/pkg/CREC-1994-08-09/html/CREC-1994-08-09-pt1-PgH84.htm.

Underwood stated that, during the one-year limitation period ending on December 1, 1946, language barriers and a misunderstanding of procedures caused many people to miss out on reparations. *Id.* At the time, "Guam was still in a state of disaster and people were still struggling to simply survive." https://www.guampedia.com/guam-world-war-ii-war-claims-legislative-history/; *see also* Senate Report 107-172 (107th Congress, June 24, 2002) ("The Guam Meritorious Claims Act of November 15, 1945 authorized the Secretary of the Navy to appoint a claims commission to pay war claims not in excess of $5,000. The commission had to forward claims in excess of $5,000 to Congress, which had to approve them. The Act required claims to be filed within one year. The short time frame for filing claims may have prevented deserving claimants from receiving compensation."); House Report 106-815 (106th Cong. Sept. 6, 2000), https://www.gpo.gov/fdsys/pkg/CRPT-106hrpt815/html/CRPT-106hrpt815.htm, ("Unfortunately, that Act never fulfilled its intended purposes due to the limited time frame for claims and the preoccupation with the local population to recover from the war, resettle their homes, and rebuild their lives.").

On the same day it enacted the Guam Meritorious Claims Act, November 15, 1945, Congress also enacted the Guam Land

Transfer Act, Public Law 79-225, 59 Stat. 584, authorizing the Secretary of the Navy to transfer lands the military no longer needed to the Government of Guam. The legislative history for that act noted that there had been extensive military acquisition of land in Guam, resulting in over 160 military and naval land holdings, which equaled "over half of the more valuable lands of the island." House Rep. No. 1136 (79th Cong., 1st Sess. Oct. 19. 1945); Sen. Rep. No. 596 (79th Cong., 1st Sess., Sept. 10, 1945). Both the House and Senate reports further state, "This increase in military and naval land requirements has created a problem in the rehabilitation of residents who have had to be moved from property acquired for governmental use and who, therefore, have to be resettled elsewhere on the island." House Rep. No. 1136; Sen. Rep. No. 596.

The reports note that much of the Spanish Crown lands were "unsuitable for military or naval installations but may be suitable for resettlement purposes." House Rep. No. 1136; Sen. Rep. No. 596. Recognizing that there was no law providing for the transfer of such lands "to former owners to replace lands taken for military and naval use," the reports said that it would be "desirable to have Federal-owned land not required for military or naval use" transferred to the Government of Guam "for retransfer and sale to dispossessed owners. This land would be supplemented by other land acquired from private owners by the

naval Government of Guam."  House Rep. No. 1136; Sen. Rep. No. 596.

This case has generated discussion by the parties about what, if any, duty the United States has delegated to Guam in the 1945 Land Transfer Act.  The Ninth Circuit says that law allowed "the United States naval government, not the territorial government, to transfer or sell property for the resettlement of the residents of Guam.  Nothing in that Act suggests an intention to delegate trust responsibility to the territorial government of Guam."  *Gov't of Guam ex rel. Guam Econ. Dev. Auth. v. United States*, 179 F.3d 630, 640–41 (9th Cir. 1999) (quotation marks and citations omitted).  But the Ninth Circuit's statement came in the context of a discussion of aboriginal rights.  As discussed later in this order, the lack of a delegated trust responsibility with respect to aboriginal title may not be the same as the absence of any duty delegated by the United States to the Government of Guam with respect to individuals dispossessed of land without regard to title at all, aboriginal or otherwise.

In January 1947, a panel was appointed to review the naval administration of Guam and American Samoa.  The recommendations of the panel are set forth in the Hopkins Committee Report for the Secretary on the Civil Governments of Guam and American Samoa.  *See* ECF No. 40-3.  In relevant part, that Hopkins Report states that no land has been conveyed to the

people of Guam pursuant to the Guam Land Transfer Act of 1945.
*See* ECF No. 40-7, Page 8 of 9 ("Persons who have been
dispossessed of their homes and land by military forces have yet
to receive any land, comparable or otherwise, in return.").  The
report characterized the Guam Land Transfer Act as setting up a
"pool from which could be allotted suitable parcels of land for
purchase by those citizens of Guam whose land has been acquired
by the United States."  *Id.*

On or about June 28, 1948, the Naval Governor of Guam,
Charles A. Pownall, wrote a letter to the Guam Congress.  Pownall
estimated that

> sixty percent of the privately-owned lands
> lying within areas held by the Government are
> either unregistered or merely provisionally
> recorded. . . . An even greater percentage of
> privately-owned land titles are involved in
> probate proceedings.  These difficulties
> exist as a result of failure on the part of
> Guamanians during past years to register the
> title to lands owned by them or to probate
> the estates of deceased persons through whom
> ownership is derived.

ECF No. 40-16, Page 6 of 8.  Thus, the Naval Government of Guam
recognized the difficulty of determining private land ownership
at that time.

Robert K. Coote, in *Land Use Conditions and Land
Problems on Guam* 3 (1951), ECF No. 40-2, Page 9 of 20, explained
that it was "difficult or impossible to identify land ownership"
because pre-World War II land records were not good or were

10

destroyed during the war.  Accordingly, returning land to people who had had land on Guam taken by the United States raised difficulties from the outset.

On August 1, 1950, Congress passed the Organic Act of Guam, establishing Guam as an organized, unincorporated territory.  64 Stat. 384 ("Sec. 3. Guam is hereby declared to be an unincorporated territory of the United States . . . . [I]ts relations with the Federal Government shall be under the general administrative supervision of the head of such civilian department or agency of the Government of the United States as the President may direct.").  Authority over Guam was transferred to the Department of Interior, effective August 1, 1950, by Executive Order 10077 of September 7, 1949. https://www.archives.gov/federal-register/codification/executive-order/10077.html.

In relevant part, the 1950 Organic Act of Guam granted United States citizenship to the following people (and their children born after April 11, 1899): 1) inhabitants of Guam on April 11, 1899, who were Spanish subjects who continued to reside in Guam as of August 1, 1950; 2) persons born on Guam who resided in Guam on April 11, 1899, who continued to reside in Guam as of August 1, 1950; and 3) all persons born on Guam on or after April 11, 1899.  *See* 64 Stat. 384 (1950).  The following is the relevant portion of the Organic Act:

SEC. 4. (a) Chapter II of the Nationality Act of 1940, as amended, is hereby further amended by adding at the end thereof the following new section:

"SEC. 206. (a) The following persons, and their children born after April 11, 1899, are hereby declared to be citizens of the United States, if they are residing on the date of enactment of this section on the island of Guam or other territory over which the United States exercises rights of sovereignty:

"(1) All inhabitants of the island of Guam on April 11, 1899, including those temporarily absent from the island on that date, who were Spanish subjects, who after that date continued to reside in Guam or other territory over which the United States exercises sovereignty, and who have taken no affirmative steps to preserve or acquire foreign nationality.

"(2) All persons born in the island of Guam who resided in Guam on April 11, 1899, including those temporarily absent from the island on that date, who after that date continued to reside in Guam or other territory over which the United States exercises sovereignty, and who have taken no affirmative steps to preserve or acquire foreign nationality.

"(b) All persons born in the island of Guam on or after April 11, 1899 (whether before or after the date of enactment of this section), subject to the jurisdiction of the United States, are hereby declared to be citizens of the United States: *Provided*, That in the case of any person born before the date of enactment of this section, he has taken no affirmative steps to preserve or acquire foreign nationality.

"(c) Any person hereinbefore described who is a citizen or national of a country other than the United States and desires to retain his present political status shall make, within two years of the date of enactment of this section, a declaration under oath of such desire, said declaration to be in form and executed in the manner prescribed by regulations. From and after the making of such a declaration any such person shall be held not to be a national of the United States by virtue of this Act.

The grant of citizenship to people born on Guam is now codified in 8 U.S.C. § 1407.

The court takes judicial notice of the 1950 Census data for Guam. *See Toj-Culpatan v. Holder*, 612 F.3d 1088, 1091 (9th Cir. 2010) (taking judicial notice of Census data). According to the 1950 Census at 54-46, Guam in 1950 had a population of 59,498. https://www.census.gov/prod/www/decennial.html (including "Census of Population and Housing, 1950" with link to

"1950 Census of Population," followed by "Vol. 1. Number of Inhabitants" and linking to "Full Document").  According to the 2010 Census, Guam's population increased by almost 100,000 people in the 60 years after Guam became a territory.  *See* https://www.census.gov/2010census/news/pdf/cb11cn179_ia_guam_totalpop_2010map.pdf (indicating that the population of Guam in 2010 was 159,358).

According to the 1950 Census at 54-38, 54-46, and 54-52, and its Table 38, 22,920 Whites lived on Guam (of which 22,513 were already United States citizens, 272 were naturalized United States citizens, including former United States nationals who had been naturalized, and 36 were United States nationals).[3] There were 27,124 Chamorros (of which 736 were already United States citizens, 440 were naturalized United States citizens, including former United States nationals who had been naturalized, and 25,788 were United States nationals).  Filipinos numbered 7,258 (of which 387 were already United States citizens, 144 were naturalized United States citizens, including former

_____

[3]The court's understanding is that the term "national" refers to persons born in or having ties to an "outlying possession of the United States."  8 U.S.C. § 1408.  In relevant part, this would include those born on Guam between 1898 and 1950.  Nationals do not qualify for rights restricted by law to citizens (e.g., the right to vote in federal elections guaranteed by the 26th Amendment to the United States Constitution, the right to be elected President as stated in Article II, Section 1 of the Constitution, and the right to be elected to the United States Senate or House of Representatives as stated in Article I, Sections 2 and 3 of the Constitution).

United States nationals who had been naturalized, and 127 were
United States nationals).  There were 91 Chinese (of which 56
were already United States citizens, 5 were naturalized United
States citizens, including former U.S. nationals who had been
naturalized, and 24 United States were nationals).  There were
2,105 in the "Other" category, defined as Japanese, Korean,
Black, and other nonwhite people (of which 1,733 were already
United States citizens, 12 were naturalized United States
citizens, including former United States nationals who had been
naturalized, and 167 were United States nationals).  The group of
354 non-Chamorro United States nationals (White, Filipino,
Chinese, and other) living on Guam in 1950 was approximately 1.4%
of the 25,788 Chamorro United States nationals living on Guam in
1950.[4]

---

[4]At the hearing on the motions, the parties did not agree
with respect to who became citizens via the Organic Act of Guam.
This court does not here decide that fact.  Nor can this court
determine on the present record whether the reference in the
1950 Census to "Chamorro" included people who identified as
Chamorro but may have also been of other races, such as children
of interracial couples.

### Table 38.—CITIZENSHIP BY RACE AND SEX, FOR GUAM: 1950

[Percent not shown where less than 0.1 or where base is less than 100]

| Race and sex | Total population | Citizen | | | | | | National | | Alien | | Citizenship not reported | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | All citizens | | Native | | Naturalized [1] | | | | | | | |
| | | Number | Percent of total | Number | Percent of total | Number | Percent of total | Number | Percent of total | Number | Percent of total | Number | Percent of total |
| **ALL RACES** | | | | | | | | | | | | | |
| Total | 59,498 | 25,697 | 43.2 | 24,824 | 41.7 | 873 | 1.5 | 26,142 | 43.9 | 7,519 | 12.6 | 140 | 0.2 |
| Male | 40,485 | 20,483 | 50.6 | 19,814 | 48.9 | 669 | 1.7 | 12,809 | 31.6 | 7,115 | 17.6 | 87 | 0.2 |
| Female | 19,013 | 5,214 | 27.4 | 5,010 | 26.4 | 204 | 1.1 | 13,342 | 70.2 | 404 | 2.1 | 53 | 0.3 |
| Persons 21 years old and over | 32,921 | 15,437 | 46.9 | 14,822 | 45.0 | 615 | 1.9 | 10,605 | 32.2 | 6,797 | 20.6 | 82 | 0.2 |
| Male | 23,585 | 12,150 | 51.5 | 11,638 | 49.3 | 521 | 2.2 | 4,790 | 20.3 | 6,585 | 27.9 | 53 | 0.2 |
| Female | 9,336 | 3,278 | 35.1 | 3,184 | 34.1 | 94 | 1.0 | 5,815 | 62.3 | 214 | 2.3 | 29 | 0.3 |
| **WHITE** | | | | | | | | | | | | | |
| Total | 22,920 | 22,785 | 99.4 | 22,513 | 98.2 | 272 | 1.2 | 36 | 0.2 | 79 | 0.3 | 20 | 0.1 |
| Male | 18,248 | 18,176 | 99.6 | 17,971 | 98.5 | 205 | 1.1 | 23 | 0.1 | 37 | 0.2 | 12 | 0.1 |
| Female | 4,672 | 4,609 | 98.7 | 4,542 | 97.2 | 67 | 1.4 | 13 | 0.3 | 42 | 0.9 | 8 | 0.2 |
| Persons 21 years old and over | 13,887 | 13,786 | 99.3 | 13,520 | 97.4 | 266 | 1.9 | 11 | 0.1 | 76 | 0.5 | 14 | 0.1 |
| Male | 10,773 | 10,728 | 99.6 | 10,528 | 97.7 | 200 | 1.9 | 5 | ...... | 36 | 0.3 | 7 | 0.1 |
| Female | 3,111 | 3,058 | 98.3 | 2,992 | 96.2 | 66 | 2.1 | 6 | 0.2 | 40 | 1.3 | 7 | 0.2 |
| **CHAMORRO** | | | | | | | | | | | | | |
| Total | 27,124 | 736 | 2.7 | 296 | 1.1 | 440 | 1.6 | 25,788 | 95.1 | 512 | 1.9 | 88 | 0.3 |
| Male | 13,403 | 468 | 3.5 | 154 | 1.0 | 314 | 2.4 | 12,463 | 94.0 | 295 | 2.2 | 50 | 0.4 |
| Female | 13,721 | 268 | 2.0 | 142 | 1.1 | 126 | 0.9 | 13,195 | 96.2 | 217 | 1.6 | 38 | 0.3 |
| Persons 21 years old and over | 11,033 | 309 | 2.8 | 77 | 0.7 | 232 | 2.1 | 10,476 | 95.0 | 202 | 1.8 | 46 | 0.4 |
| Male | 5,101 | 243 | 4.8 | 31 | 0.6 | 212 | 4.2 | 4,712 | 92.4 | 120 | 2.4 | 26 | 0.5 |
| Female | 5,932 | 66 | 1.1 | 46 | 0.8 | 20 | 0.3 | 5,764 | 97.2 | 82 | 1.4 | 20 | 0.3 |
| **FILIPINO** | | | | | | | | | | | | | |
| Total | 7,258 | 387 | 5.3 | 243 | 3.3 | 144 | 2.0 | 127 | 1.7 | 6,719 | 92.6 | 25 | 0.3 |
| Male | 7,009 | 267 | 3.8 | 144 | 2.1 | 123 | 1.8 | 71 | 1.0 | 6,649 | 94.9 | 22 | 0.3 |
| Female | 249 | 120 | 48.2 | 99 | 39.8 | 21 | 8.4 | 56 | 22.5 | 70 | 28.1 | 3 | 1.2 |
| Persons 21 years old and over | 6,640 | 182 | 2.7 | 80 | 1.2 | 102 | 1.5 | 34 | 0.5 | 6,407 | 96.5 | 17 | 0.3 |
| Male | 6,546 | 157 | 2.4 | 59 | 0.9 | 98 | 1.5 | 21 | 0.3 | 6,352 | 97.0 | 16 | 0.2 |
| Female | 94 | 25 | ...... | 21 | ...... | 4 | ...... | 13 | ...... | 55 | ...... | 1 | ...... |
| **CHINESE** | | | | | | | | | | | | | |
| Total | 91 | 56 | ...... | 51 | ...... | 5 | ...... | 24 | ...... | 11 | ...... | ...... | ...... |
| Male | 54 | 31 | ...... | 28 | ...... | 3 | ...... | 14 | ...... | 9 | ...... | ...... | ...... |
| Female | 37 | 25 | ...... | 23 | ...... | 2 | ...... | 10 | ...... | 2 | ...... | ...... | ...... |
| Persons 21 years old and over | 53 | 34 | ...... | 29 | ...... | 5 | ...... | 8 | ...... | 11 | ...... | ...... | ...... |
| Male | 35 | 19 | ...... | 16 | ...... | 3 | ...... | 7 | ...... | 9 | ...... | ...... | ...... |
| Female | 18 | 15 | ...... | 13 | ...... | 2 | ...... | 1 | ...... | 2 | ...... | ...... | ...... |
| **OTHER RACES** | | | | | | | | | | | | | |
| Total | 2,105 | 1,733 | 82.3 | 1,721 | 81.8 | 12 | 0.6 | 167 | 7.9 | 198 | 9.4 | 7 | 0.3 |
| Male | 1,771 | 1,541 | 87.0 | 1,532 | 86.5 | 9 | 0.5 | 99 | 5.6 | 125 | 7.1 | 6 | 0.3 |
| Female | 334 | 192 | 57.5 | 189 | 56.6 | 3 | 0.9 | 69 | 20.4 | 73 | 21.9 | 1 | 0.3 |
| Persons 21 years old and over | 1,308 | 1,126 | 86.1 | 1,116 | 85.3 | 10 | 0.8 | 76 | 5.8 | 101 | 7.7 | 5 | 0.4 |
| Male | 1,127 | 1,012 | 89.8 | 1,004 | 80.1 | 8 | 0.7 | 45 | 4.0 | 66 | 5.9 | 4 | 0.4 |
| Female | 181 | 114 | 63.0 | 112 | 61.9 | 2 | 1.1 | 31 | 17.1 | 35 | 19.3 | 1 | 0.6 |

[1] Includes former nationals who have been naturalized.

"[B]y 1950, more than 50 percent of the actual acreage in Guam was occupied by inactive military installations." *Gov't of Guam ex rel. Guam Econ. Dev. Auth.*, 179 F.3d at 639 (citing *Civil Gov't of Guam: Hearing on S. 185, S. 1892 & H.R. 7273 Before a Senate Subcomm. of the Comm. on Interior and Insular*

*Affairs*, 81ˢᵗ Cong. 62, 2d Sess. (Apr. 19, 1950)).  As with the Guam Land Transfer Act of 1945, Congress stated with respect to the Organic Act of Guam, "The committee recommends that the need of the military for the land now held by it should be carefully reexamined, with the object of releasing at the first possible moment all lands not actually required for military purposes." *Gov't of Guam ex rel. Guam Econ. Dev. Auth.*, 179 F.3d at 639 (quoting House Rep. No. 81–1677 (1950)).  Congress similarly directed "[t]hat the armed forces immediately resurvey their military needs for lands throughout the Trust Territory, and in Guam and American Samoa, so that all land not absolutely required for military purposes may be returned to private ownership and use."  *Id.* (quoting *Hearing on H.R. 4499 Before the Senate Comm. on Interior and Insular Affairs*, 81ˢᵗ Cong. 20, Exec. Sess. (Jan. 30, 1950)).

Section 5(n) of the Organic Act of Guam, codified as 48 U.S.C. § 1421b(n), provides: "No discrimination shall be made in Guam against any person on account of race, language, religion, nor shall the equal protection of the laws be denied."

Congress granted Guam broad authority to control land that the United States did not reserve to itself.  In Section 28(b) of the Organic Act of Guam, codified as 48 U.S.C. § 1421f(b), Congress gave the President ninety days to reserve

real or personal property on Guam.  Any property not so reserved
was placed

> under the control of the government of Guam,
> to be administered for the benefit of the
> people of Guam, and the legislature shall
> have authority, subject to such limitations
> as may be imposed upon its acts by this
> chapter or subsequent Act of the Congress, to
> legislate with respect to such property, real
> and personal, in such manner as it may deem
> desirable.

*Id.*

In Section 28(c) of the Organic Act of Guam, codified
as 48 U.S.C. § 1421f(c), all property owned by the United States
in Guam that was not transferred to the Government of Guam was
transferred to the "administrative supervision of the head of the
department or agency designated by the President."

Within the required 90 days, President Harry S. Truman
issued Executive Order 10178 of October 30, 1950, setting forth
the land reserved by the Government and transferring other land
to the Secretary of the Interior.  *See*
https://www.trumanlibrary.org/executiveorders/index.php?pid=246.
The Ninth Circuit has characterized this executive order as
reserving "almost all the land subject to § 28(b)."  *Gov't of
Guam ex rel. Guam Econ. Dev. Auth.*, 179 F.3d at 639.  The
Executive Order also referred to certain other real property of
the United States in Guam as having been selected

> by the Secretary of the Navy for transfer or
> sale pursuant to the act of November 15 1945,

17

> 59 Stat. 584 [the Guam Land Transfer Act], to
> persons in replacement of lands acquired for
> military or naval purposes in Guam, and such
> property should remain available for
> disposition by the Secretary of the Interior
> in his discretion under section 28(c) of the
> said Organic Act of Guam.

*Id.*

In 1952, the Department of the Interior transferred certain federal lands to the Government of Guam. *See* ECF No. 40-17, Pages 12 to 26 of 28. An explanatory statement accompanying the transfer stated:

> By this conveyance, the people of Guam regain
> jurisdiction over lands which were claimed by
> the Spanish Crown during the Spanish
> occupation, beginning in the 16th Century.
> These lands, amounting to approximately
> 30,000 acres, were ceded to the United States
> by the Treaty of Paris in 1898. This acreage
> constitutes about 21 percent of the total
> land area of the island.

ECF No. 40-17, Page 9 of 28. The parties are not disputing that the Spanish Crown lands transferred to Guam in 1952 are part of the Chamorro Land Trust.

The 1952 transfer states:

> pursuant to the authority vested in the
> Secretary of the Interior by Executive Order
> No. 10178 and under section 28(c) of the
> Organic Act of Guam, for the consideration of
> on dollar ($1), there is hereby conveyed to
> the government of Guam title to all of the
> lands reserved to the United States and
> transferred to the administrative supervision
> of the Secretary of the Interior by Executive
> Order No. 10178, it being expressly
> stipulated that if the Government of Guam,
> without prior approval of the Secretary of

> the Interior, sells, leases or otherwise
> disposes of any parcels of said lands for
> other than (1) the purposes of the Guam
> rehabilitation and resettlement program in
> accordance with section 40 of Public Law 33
> of the First Guam Congress, and (2) the
> homestead program in accordance with Article
> 8 of Public Law 33, title to such parcel or
> parcels of land shall automatically revert to
> the United States.

ECF No. 40-17, Page 13 of 28.  The transfer further states:

> the objectives of the Guam rehabilitation and
> resettlement program may best be realized by
> placing administrative responsibility for
> implementation of this program in the
> government of Guam, to be carried out in
> accordance with the priorities established in
> section 40 of Public Law 33 of the First Guam
> Congress.

ECF No. 40-17, Page 7 of 28.

In other words, the United States delegated to Guam the administration of the resettlement program relating to land taken by the United States.  Possibly, the United States was recognizing the difficulties presented by the paucity of records.

In the cover letter sent by the Secretary of the Interior to the Governor of Guam, the Secretary reiterated:

> By virtue of this conveyance the Government
> of Guam obtains a fee simple determinable
> title to the lands so transferred.  The
> Government of Guam may, without the approval
> of the Secretary of the Interior, sell, lease
> or otherwise dispose of any of these lands
> for (1) rehabilitation and resettlement
> purposes in accordance with section 40 of
> Public Law 33 of the First Guam Congress, and
> (2) for homestead purposes in accordance with
> Article 8 of Public Law 33. . . .  Under the
> terms of the conveyance, however, the sale,

> lease or disposal of these lands for other
> than homestead or rehabilitation and
> resettlement purposes would automatically
> cause a reversion to the United States of
> title to any parcel or parcels of land so
> disposed of unless prior approval of the
> Secretary had been obtained.

Letter from Oscar L. Chapman to Gov. Carlton Skinner (Feb. 26, 1952), ECF No. 40-17, Page 5 of 28.

Public Law 33 of the First Guam Legislature (1951) regulates the use and disposition of public lands. *See* http://www.guamlegislature.com/Public_Laws_1st/PL01-033.pdf.

Section 40 of Public Law 33 states:

> Section 40. The Board, in considering
> and acting upon applications to lease or buy
> Government real property for residential or
> agricultural purposes, shall apply and
> observe the following priorities:
>
> First, persons who have had all of their
> land acquired by the United States, the Naval
> Government of Guam, or the Government of
> Guam, and who have owned no other land since
> January l, 1946;
>
> Second, persons who have had a
> substantial portion of their land acquired by
> the United States, the Naval Government of
> Guam, or the Government of Guam, since July
> l, 1944, the remaining portion whose land is
> not adequate or sufficient for reasonable
> agricultural or residential purposes.

*Id.*

Section 52 of Article 8 of Public Law 33 provides for homesteads for agricultural or grazing purposes. Section 53 of Article 8 authorizes homesteads to be given to "[e]very person

20

who is the head of a family, eighteen or more years old, a
citizen of the United States, a resident of Guam for at least
five years preceding the date of application and who has neither
purchased more than one half hectare of land from the Naval
Government of Guam or the Government of Guam since July 1, 1944,
nor homestead and land on Guam for fifteen years preceding the
date of application." *Id.*

Not only did the Secretary of the Interior mandate that
certain land be used in a manner consistent with Section 40 and
Article 8 of Public Law 33, Congress appears to have approved
those sections, as Congress did not timely annul them. Before
1968, the Organic Act of Guam provided that all Guam laws were to
be sent to Congress, which could, within one year, annul any
particular law before the law would be "deemed to have been
approved." *See* 64 Stat. 389 (1950); *see also Ramsey v. Chaco*,
549 F.2d 1335, 1338 (9th Cir. 1977) ("Prior to amendment in 1968,
however, the Organic Act also provided that all laws enacted by
the Guam legislature ultimately would be reported to Congress,
and unless Congress acted to annul the law within one year, it
was deemed to have congressional approval."). As described
above, Section 40 of Public Law 33 mandated that the Land Board,
"in considering and acting upon applications to lease or buy
Government real property for residential or agricultural
purposes," give priority to persons who had had their land taken

by the United States, the Naval Government of Guam, or the Government of Guam since July 1, 1944 (approximately 3 weeks before the United States retook possession of Guam from Japan in World War II).  Because Congress did not annul Section 40 of Public Law 33, it is deemed to have approved it.

In 1975, Guam established the Chamorro Land Trust Commission through the Chamorro Land Trust Act.  In relevant part, that Act provided leases of "Chamorro homelands" and loans to the "native Chamorro."[5]  *See* Guam Pub. L. 12-226 (1975), http://www.guamlegislature.com/Public_Laws_12th/PL12-226.pdf. The Act originally defined "native Chamorro" as "any person who the Commission determines to be of at least one-fourth part of the blood of any person who inhabited the island prior to 1898." *Id.*  In 1980, that definition was changed to "any person who became a U.S. Citizen by virtue of the authority and enactment of the Organic Act of Guam or descendants of such person."  *See* Guam Pub. L. 15-118 (1980),

---

[5]Under § 75107, the Chamorro Land Trust Commission "is authorized to lease to native Chamorros the right to the use and occupancy of a tract or tracts of Chamorro homelands."  Under § 75107, the Chamorro Land Trust Commission is authorized to enter into 99-year leases of the tracts of land for one dollar per year.  Under § 75112, the Chamorro Land Trust Commission may guarantee loans or make loans to native Chamorros, including loans at below-market rates.  Guam says that it has not implemented the loan program.  *See* Decl. of Michael J.B. Borja ¶ 5, ECF No. 40-18, Page 13 of 37.  This court does not judicially notice that fact, as the implementation of the loan program does not affect whether the Fair Housing Act has been violated as alleged in the Complaint.

[http://www.guamlegislature.com/Public_Laws_15th/PL%2015-118.pdf](http://www.guamlegislature.com/Public_Laws_15th/PL%2015-118.pdf).
That amended definition is the definition of "native Chamorro" in effect today.  *See* 21 GCA § 75101(d).

In its Reply in Support of its Motion for Judgment on the Pleadings, the United States concedes that "a small number of non-Chamorros may qualify [for benefits under the Chamorro Land Trust Act], and some ethnic Chamorros do not."  ECF No. 43, Page 8 of 20.  The reference to a "small number of non-Chamorros" eligible for benefits under the Chamorro Land Trust Act appears to be a recognition that the 1950 Census indicates that some individuals not described as Chamorros were among those who became United States citizens through the Organic Act of Guam.  Additionally, there is no dispute that Chamorros born on Guam who cannot trace their citizenship to a birthright citizenship as of 1950 do not qualify as "native Chamorro" for purposes of the Chamorro Land Trust Act.  Take, for example, a person born in 1949 on Guam to American citizens of Chamorro descent who were born in California but moved to Guam in 1949.  That person would not qualify as "native Chamorro" because that person was already an American citizen by virtue of having been born to people who were American citizens before the passage of the Organic Act of Guam in 1950.  That person could not be said to have become an American citizen under the Organic Act, a requirement for fitting

into the definition of "native Chamorro" in the Chamorro Land
Trust Act.

        In relevant part, the Chamorro Land Trust Act defines
"Chamorro homelands" as "all lands given the status of Chamorro
homelands under the provisions of § 75105 of this Chapter."
*See* 21 GCA § 75101(c).  Under § 75105, all "available lands shall
assume the status of Chamorro homelands and shall be under the
control of the [Chamorro Land Trust] Commission."  Under § 75104,
"available lands" are all government lands except lands dedicated
for a specific purpose and other reserved land.  There is no
dispute that at least some of the Spanish Crown lands transferred
to Guam in 1952 are part of the trust.  However, the record does
not establish exactly what land is part of the trust.

        Despite the passage of the Chamorro Land Trust Act, it
does not appear that the Act was implemented until a court in
1993 ordered implementation.  *See* Decision and Order on
Petitioners' Writ of Mandate, *Santos v. Ada*, Special Proceeding
Case No. SP0083-92 (Guam Sup. Ct. 1993), ECF No. 34-1.  Guam's
Chamorro Land Trust Commission began operating in 1995, the same
year it began accepting applications for leases under the
Chamorro Land Trust Act.  *See* Guam Pub. L. 23-38, § 5.1 (1995),
http://www.guamlegislature.com/Public_Laws_23rd/P.L.%2023-38%20(S
B%20317%20(LS))pdf.pdf.

Now, nearly a quarter century after implementation began, the United States challenges that implementation of the Chamorro Land Trust Act as racially discriminatory.

## IV.        MOTION FOR JUDGMENT ON THE PLEADINGS STANDARD.

Rule 12(c) states, "After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings."  The standard governing a Rule 12(c) motion for judgment on the pleadings is "functionally identical" to that governing a Rule 12(b)(6) motion.  *United States ex rel. Caffaso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011); *accord Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) ("Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.").

For a Rule 12(c) motion, the allegations of the nonmoving party are accepted as true, while the allegations of the moving party that have been denied are assumed to be false.  *See Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989).  A court evaluating a Rule 12(c) motion must construe factual allegations in a complaint in the light most favorable to the nonmoving party.  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  Under Rule 12(c), "'Judgment on

the pleadings is properly granted when, accepting all factual allegations as true, there is no material fact in dispute, and the moving party is entitled to judgment as a matter of law.'" *Chavez v. United States,* 683 F.3d 1102, 1108 (9th Cir. 2012) (quoting *Fleming*, 581 F.3d at 925).

**V.      ANALYSIS.**

In relevant part, the Fair Housing Act makes it unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.
>
> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604. The Fair Housing Act also makes it unlawful

> for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a

transaction, or in the terms or conditions of
such a transaction, because of race, color,
religion, sex, handicap, familial status, or
national origin.

42 U.S.C.A. § 3605(a).

The Fair Housing Act "was enacted to eradicate
discriminatory practices within a sector of our Nation's
economy." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive
Communities Project, Inc.*, 135 S. Ct. 2507, 2521 (2015) (holding
that disparate impact claims are cognizable under the Fair
Housing Act). To that end, courts have noted that "Section
3604(a) is designed to ensure that no one is denied the right to
live where they choose for discriminatory reasons." *Southend
Neighborhood Imp. Ass'n v. St. Clair Cty.*, 743 F.2d 1207, 1210
(7th Cir. 1984); *see also Jersey Heights Neighborhood Ass'n v.
Glendening*, 174 F.3d 180, 192 (4th Cir. 1999) (same); *United
States v. Starrett City Assocs.*, 840 F.2d 1096, 1100 (2d Cir.
1988) (same).

Persons aggrieved under the Fair Housing Act may bring
a civil action directly against defendants pursuant to 42 U.S.C.
§ 3613. In addition, the United States, through its Attorney
General, may assert claims for violations of the Fair Housing Act
under 42 U.S.C. § 3614, which allows such claims when 1) any
person or group of persons is engaged in a pattern or practice of
resistance to the full enjoyment of any Fair Housing Act rights,
or 2) any group of persons has been denied Fair Housing Act

rights and such denial raises an issue of general public importance.  The United States contends that the Chamorro Land Trust violates the Fair Housing Act by discriminating against non-Chamorros on the basis of race and/or national origin.[6]

> **A.    The Record Does Not Establish Whether the Chamorro Land Trust Act Relies On An Impermissible Race-Based Classification or a Permissible Political Classification.**

The Supreme Court has stated that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny.  In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).  "When no suspect class is involved and no fundamental right is burdened, we apply a rational basis test to determine the legitimacy of the classifications." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277-78 (9th Cir. 2004).  "The conclusion of whether a governmental act is subject to strict scrutiny or rational basis examination is

---

[6]Courts have sometimes analyzed Indian tribe discrimination as national origin discrimination.  *See Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 154 F.3d 1117, 1120 (9th Cir. 1998).  At other times, courts have analyzed such discrimination as race discrimination.  *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 479 (1976).  In its motion, the United States categorizes both race and national origin discrimination as race discrimination for ease of reference.

important, as it often determines the outcome of the inquiry."
*Id.* The strict scrutiny/rational basis dichotomy normally
applies to Equal Protection Clause challenges, but cases
interpreting which standard to apply in the constitutional
context are instructive with respect to the Fair Housing Act race
and national origin discrimination claims asserted in this case,
because the Equal Protection cases discuss how to define race or
national origin discrimination.

The United States argues that the Charmorro Land Trust
Act discriminates with respect to housing benefits (particularly
leases of land) based on a racial classification by providing a
housing benefit only to "native Chamorros." Guam, on the other
hand, argues that "native Chamorro" is defined as a political
classification, not as a race or national origin classification.

The United States argues that the Chamorro Land Trust
Act discriminates on the basis of race or national origin because
the Act benefits only Chamorros in violation of the Fair Housing
Act. This court does not accept this proposition on the present
record. While the Act mentions Chamorros, the Act is for the
benefit of "native Chamorros," a category specifically defined by
the Act. The court therefore starts with that definition.

Originally, "native Chamorro" was defined as "any
person who the Commission determines to be of at least one-fourth
part of the blood of any person who inhabited the island prior to

1898." While the original definition may have raised the specter of race- or national origin-based discrimination, the definition of "native Chamorro" was changed in 1980. The present definition refers to "any person who became a U.S. Citizen by virtue of the authority and enactment of the Organic Act of Guam or descendants of such person." The present definition does not, on its face, rely on race or national origin. The present definition is facially neutral in that respect. Of course, facially neutral criteria do not guarantee that the "native Chamorro" definition is not in fact discriminatory.

In *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013), the Ninth Circuit noted that a seemingly neutral law can be a proxy for discrimination. Proxy discrimination "arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Id.* This court therefore turns to the 1950 Organic Act of Guam to examine whether the reference to it in the Chamorro Land Trust Act amounts to proxy discrimination.

The Organic Act granted United States citizenship to the following people (and their children born after April 11,

1899): 1) inhabitants of Guam on April 11, 1899, who were Spanish subjects who continued to reside in Guam as of August 1, 1950; 2) persons born on Guam who resided in Guam on April 11, 1899, who continued to reside in Guam as of August 1, 1950; and 3) all persons born on Guam on or after April 11, 1899. The 1950 Census indicates that 354 non-Chamorro (White, Filipino, Chinese, and other) individuals became "U.S. Nationals," presumably via the Organic Act. That number is approximately 1.4% of the 25,788 Chamorro "U.S. Nationals" in 1950 who appear to have become United States citizens via the Organic Act of Guam. As this court noted earlier, the Census data may include children of interracial couples, and it is unclear whether those children identified as Chamorro for purposes of the 1950 Census.

In *Davis v. Guam*, No. CV 11-00035, 2017 WL 930825, at *6 (D. Guam Mar. 8, 2017), the 354 non-Chamorros were described as a "diminutive number" compared to the 25,788 Chamorros. *Davis* examined whether the term "Native Inhabitants of Guam" was defined in a racially discriminatory way and served as a proxy for race-based discrimination in the context of a law limiting who could vote in a plebiscite. The plebiscite was a territorial election concerning Guam's future relationship with the United States. The aim was to determine whether native inhabitants preferred independence, free association, or statehood. 2017 WL 930825, at *1. In a ruling that is the subject of an appeal

pending in the Ninth Circuit, the court said that the limitation on who could vote violated the Fifteenth Amendment's prohibition on a race-based denial or abridgment of the right to vote. *Id.* at *6.

The definition of "Native Inhabitants of Guam" that was at issue in *Davis* is similar to the original definition of "native Chamorro" in the Chamorro Land Trust Act. However, the conclusion in *Davis* that the former definition amounts to a proxy for race discrimination does not necessarily apply to the issue before this court.

First, the definition in the present case, which indisputably includes some non-Chamorro individuals, comes from 1980 and does not track the original definition, which was similar to the definition in *Davis*. Second, the present case may end up turning on the history of the United States' attempts to rehabilitate or compensate people for land taken by the United States. *Davis* involved no such compensatory argument. Instead, *Davis* turned on a voting requirement that limited the right to vote in a territory-wide election to "native inhabitants of Guam."

The determination of whether a provision is racially discriminatory affects the level of scrutiny a court gives the challenged provision. In *Morton v. Mancari*, 417 U.S. 535 (1974), the Supreme Court held that, while most race-based preferences

are subject to "strict scrutiny" review, preferences given to American Indian tribes are reviewed under the "rational basis" standard. In so holding, the Supreme Court recognized that Congress had plenary power to deal with the "special problems of Indians." *Id.* at 551-52. *Morton* arose out of a challenge to an employment preference given to qualified Indians for jobs in the Bureau of Indian Affairs. *Morton* discussed the "special relationship" the United States had with Indian tribes--that of "guardian-ward":

> "In the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, needing protection against the selfishness of others and their own improvidence. Of necessity the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic. . . ."

*Morton*, 417 U.S. at 552 (quoting *Board of County Comm'rs v. Seber*, 318 U.S. 705, 715 (1943)).

Given that relationship, *Morton* ruled that the employment preference given to qualified Indians was not racial discrimination. "Indeed, it [was] not even a 'racial' preference." *Morton*, 417 U.S. at 552. The Supreme Court therefore applied a rational basis test, stating, "As long as the special treatment can be tied rationally to the fulfillment of

Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555.

Even if *Morton* does not entirely apply here given the Fair Housing Act context and the lack of any federal designation of Chamorros as an American Indian tribe, *Morton* provides some guidance with respect to whether the Chamorro Land Trust Act is based on a racial or a political classification. *Morton* suggests that this case should not necessarily be decided along the same lines as *Davis*. The *Davis* focus on whether an allegedly racial requirement for voting in a territorial election violated the Fifteenth Amendment might not have turned on the federal government's "special relationship" with "native Chamorros."

Since *Morton*, courts have distinguished between impermissible differential treatment of groups based on race or national origin and permissible differential treatment of Indian tribes based on political classifications.

*Davis* was decided in the aftermath of *Rice v. Cayetano*, 528 U.S. 495, 499 (2000), in which the Supreme Court invalidated a Hawaii law limiting participation in an election for trustees of the Office of Hawaiian Affairs to Hawaiians. Only descendants of Hawaiian ethnicity were allowed to vote for trustees, who were to oversee certain benefits to Hawaiians. The Court held that denying non-Hawaiians the right to vote violated the Fifteenth Amendment. *Rice* recognized that "Congress may fulfill its treaty

34

obligations and its responsibilities to the Indian tribes by enacting legislation dedicated to their circumstances and needs," but *Rice* declined to extend *Morton* beyond the preference given to a federally recognized Indian tribe, which Hawaiians were not. *Id.* at 519-20. The Office of Hawaiian Affairs election was an election held by the State of Hawaii, as opposed to an election administered by a tribe (a quasi-sovereign). The election involved an "arm of the state" that the Supreme Court said was prohibited by the Fifteenth Amendment from discriminating based on race. *Id.* at 521-22.

*Rice* noted, "Ancestry can be a proxy for race." *Rice*, 528 U.S. at 514. The Court said that, in limiting who could vote to "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii," Hawaii used ancestry "as a racial classification and for a racial purpose." *Id.* at 515.

"*Rice* concerned elections of the State of Hawaii to which the Fifteenth Amendment applied, and application of [*Morton v.*] *Mancari* to such facts would permit a State, by racial classification, to fence out whole classes of its citizens. In short, at its core, *Rice* concerned the rights of individuals, not the legal relationship between political entities." *Kahawaiolaa*

*v. Norton*, 386 F.3d 1271, 1279 (9ᵗʰ Cir. 2004) (quotation marks, alterations, and citations omitted).

Like *Rice*, the *Davis* case dealt with the Fifteenth Amendment.[7] A determination going to voting rights is not necessarily dispositive of whether the term "native Chamorro" is a racial or political classification for purposes of preferences given to indigenous people based on circumstances and needs. In the present case, Guam asks this court to consider the taking of land from people in Guam who should have some recompense. Those people are identified in terms of the United States citizenship conferred on them when Guam became a United States territory. This case turns on whether that is or is not a political classification as opposed to a racial one. *Rice* and *Davis* are therefore distinguishable.

---

[7]The Ninth Circuit reached a similar result in *Davis v. Commonwealth Election Commission*, 844 F.3d 1087 (9ᵗʰ Cir. 2016), which held that a provision restricting voting in certain Northern Mariana Islands elections to individuals of Northern Mariana descent violated the Fifteenth Amendment by limiting voting on the basis of race. Unlike elections within American Indian tribes that are "quasi-sovereign" and are given wide latitude with respect to their internal affairs, the Northern Mariana elections affected the entire commonwealth. Cases giving such wide latitude to American Indian tribes were held to be inapplicable. *Id.* at 1094. The present case, by contrast, raises the issue of whether the United States intended land to be administered for the benefit of people the United States had taken land from.

This court has some guidance from the Ninth Circuit regarding political classifications.  In *EEOC v. Peabody W. Coal Co.*, 773 F.3d 977 (9th Cir. 2014), the Ninth Circuit upheld an employment preference required by leases concerning a coal mining enterprise on Hopi and Navajo reservations.  The Ninth Circuit looked to *Morton* in determining that the tribe-specific preference was based on the same policy considerations at issue in *Morton*--the unique obligations Congress had toward Indians. *Id.* at 987-88.  The Ninth Circuit concluded that the employment preference was based on a "political classification," rather than a race-based classification.

In *Kahawaiolaa*, 386 F.3d at 1274, a group of native Hawaiians complained that the Department of the Interior was excluding native Hawaiians from Department regulations that recognized Indian tribes.  The Department was limiting eligibility for consideration as a tribe to groups in the "contiguous 48 states and Alaska."  The Ninth Circuit ruled that regulations pertaining to recognition of Indian tribes involved political concerns, not concerns that were racial in nature. Accordingly, the Ninth Circuit applied a rational basis review of the regulations.  *Id.* at 1279.  The Ninth Circuit stated: "Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe

as a political entity." *Id.* at 1273 (quotation marks and citation omitted).

The Ninth Circuit returned to the issue of how Hawaiians are treated in *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 850 (9th Cir. 2006) (en banc). In a concurring opinion, Judge William A. Fletcher, joined by Judges Harry Pregerson, Stephen R. Reinhardt, Richard A. Paez, and Johnnie B. Rawlinson, noted that Congress has enacted more than 150 laws that extend to native Hawaiians the same rights and privileges accorded to American Indians, Alaskan Natives, and Aleut communities. The concurrence noted that Congress had emphasized that it "d[id] not extend services to Native Hawaiians because of their race, but because of their unique status as indigenous people of a once sovereign nation as to whom the United States has established a trust relationship." *Id.* (quoting 20 U.S.C. § 7512(12)(B)). "The basis for this exercise of power is Congress' conclusion that 'Native Hawaiian,' like 'Alaska Native' and 'Indian,' is a political classification subject to the special relationship doctrine." *Id.* at 852.

In so stating, the concurrence recognized that "the Supreme Court has not insisted on continuous tribal membership, or tribal membership at all, as a justification for special treatment of Indians." *Id.* at 851. Judge Fletcher wrote:

> In *United States v. John*, 437 U.S. 634, 98 S.
> Ct. 2541, 57 L. Ed. 2d 489 (1978), decided

38

> after [*Morton v.*] *Mancari*, the Court held
> that "Indian country," as used in 18 U.S.C.
> § 1151, included the Choctaw Indian
> Reservation in Mississippi.  The Court noted
> that for many years the Choctaw lands in
> Mississippi had not been reservation lands,
> and that some Choctaws may have been
> considered to be reservation Indians based on
> their having "one-half or more Indian blood"
> rather than on any tribal membership. Id. at
> 650, 98 S. Ct. 2541.  The Court concluded,
> "Neither the fact that the Choctaws in
> Mississippi are merely a remnant of a larger
> group of Indians, long ago removed from
> Mississippi, nor the fact that federal
> supervision over them has not been
> continuous, destroys the federal power to
> deal with them."  *Id.* at 653, 98 S. Ct. 2541.

Doe, 470 F.3d at 851.

Further guidance relating to Indian Tribes is found in *Alaska Chapter, Associated General Contractors of America, Inc. v. Pierce*, 694 F.2d 1162 (9th Cir. 1982).  In that case, the Ninth Circuit applied the *Morton* analysis to a contract in favor of indigenous people in Alaska.  Those indigenous people had not at the time been recognized by the Bureau of Indian Affairs as being "Indian tribes."  *See* Bureau of Indian Affairs, Indian Tribal Entities That Have a Government-to-Government Relationship With the United States, 46 Fed. Regis. 35360 (July 8, 1981) (listing "tribal entities that have a government-to-government relationship with the United States").  *Pierce* nevertheless used the *Morton* analysis, applying the rational basis test in reviewing benefits being provided to "any person recognized as being an Indian or Alaskan Native by a tribe, the Government, or

any state." *Id.* at 1168 n.8. Notwithstanding the different histories that "Alaskan Natives" and "American Indians" had had with the United States, *Pierce* noted that "Alaskan Natives" "have been considered to have the same status as other federally recognized American Indians" and were "under the guardianship of the federal government and entitled to the benefits of the special relationship." *Id.* n.10.

*Morton*, *Peabody W. Coal Co.*, *Kahawaiolaa*, the concurrence in *Doe*, and *Pierce* all examined whether the United States intended to provide special treatment to an indigenous people because of the United States' unique relationship with those people. The record relating to the present motions raises at least the possibility that land currently in the Chamorro Land Trust was specifically designated by the United States to be used to rehabilitate and resettle indigenous individuals from whom the United States had taken land.

In 1952, the Department of the Interior conditionally transferred the former Spanish Crown lands to the Government of Guam. *See* ECF No. 40-17, Pages 12 to 26 of 28. The transfer

> expressly stipulated that if the Government
> of Guam, without prior approval of the
> Secretary of the Interior, sells, leases or
> otherwise disposes of any parcels of said
> lands for other than (1) the purposes of the
> Guam rehabilitation and resettlement program
> in accordance with section 40 of Public Law
> 33 of the First Guam Congress, and (2) the
> homestead program in accordance with Article
> 8 of Public Law 33, title to such parcel or

> parcels of land shall automatically revert to
> the United States.

ECF No. 40-17, Page 13 of 28.  The transfer restricted the use of some of the Spanish Crown lands, amounting to about one-fourth of Guam.  The transfer further stated:

> the objectives of the Guam rehabilitation and
> resettlement program may best be realized by
> placing administrative responsibility for
> implementation of this program in the
> government of Guam, to be carried out in
> accordance with the priorities established in
> section 40 of Public Law 33 of the First Guam
> Congress.

ECF No. 40-17, Page 7 of 28.

In the cover letter sent by the Secretary of the Interior to the Governor of Guam that accompanied the copy of the land transfer, the Secretary reiterated:

> By virtue of this conveyance the Government
> of Guam obtains a fee simple determinable
> title to the lands so transferred.  The
> Government of Guam may, without the approval
> of the Secretary of the Interior, sell, lease
> or otherwise dispose of any of these lands
> for (1) rehabilitation and resettlement
> purposes in accordance with section 40 of
> Public Law 33 of the First Guam Congress, and
> (2) for homestead purposes in accordance with
> Article 8 of Public Law 33. . . .  Under the
> terms of the conveyance, however, the sale,
> lease or disposal of these lands for other
> than homestead or rehabilitation and
> resettlement purposes would automatically
> cause a reversion to the United States of
> title to any parcel or parcels of land so
> disposed of unless prior approval of the
> Secretary had been obtained.

Letter from Oscar L. Chapman to Gov. Carlton Skinner (Feb. 26, 1952), ECF No. 40-17, Page 5 of 28.

Section 40 of Public Law 33 requires Guam, "in considering and acting upon applications to lease or buy Government real property for residential or agricultural purposes," to give the following  priorities:

> First, persons who have had all of their land acquired by the United States, the Naval Government of Guam, or the Government of Guam, and who have owned no other land since January l, 1946;
>
> Second, persons who have had a substantial portion of their land acquired by the United States, the Naval Government of Guam, or the Government of Guam, since July l, 1944, the remaining portion whose land is not adequate or sufficient for reasonable agricultural or residential purposes.

http://www.guamlegislature.com/Public_Laws_1st/PL01-033.pdf.

To the extent Spanish Crown lands are included in the Chamorro Land Trust, this court has before it the issue of whether the United States has authorized Guam to lease or sell that land to people who had had land taken from them by the United States.  Viewed in the light most favorable to Guam for purposes of the United States' Motion for Partial Judgment on the Pleadings, the United States might be said to have taken land from the "native Chamorro" people and then charged Guam with returning it in the face of scant or nonexistent land ownership records.

While the Chamorro Land Trust Act may not be a perfect means of returning lands to people who had land taken from them, the lack of records may make the Chamorro Land Trust Act a reasonable means of returning land.  This court is not here actually making that determination.  This court is only saying that it cannot enter judgment for the United States as a matter of law on the limited record before the court.  Certainly this court cannot say whether the Chamorro Land Trust Commission is actually returning land to the very people from whom land was taken.  While the United States points out that the Chamorro Land Trust Act does not ask potential beneficiaries whether they or someone in their family had land taken from them by the United States, the current process may well be an effective way of returning land, as required by the United States in the Land Transfer Act.

If Guam was required by the United States to seek to correct an injustice caused by the United States' taking of land from the indigenous people of Guam, the United States might at least arguably have recognized "native Chamorros" for special treatment.  *See Kahawaiolaa*, 386 F.3d at 1273 ("Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity." (quotation marks and citation omitted)).  The Chamorro Land Trust Act may be implementing the intent of the

1945 Land Transfer Act, which authorized the federal government to transfer land for resettlement purposes, as well as the Organic Act of Guam, which expressed a desire to return to the people of Guam land that was taken. The reasoning of *Morton*, *Peabody W. Coal Co.*, *Kahawaiolaa*, the concurrence in *Doe*, and *Pierce* may allow the conclusion that, in directing Guam to take action to aid people from whom the United States took land (the "native Chamorros"), the United States may have intended that Guam give special treatment to people within a political rather than a racial classification.

This court cannot tell from the record whether and to what extent the Chamorro Land Trust consists of Spanish Crown Lands that the United States directed Guam to administer for the benefit of people who had had their land taken by the United States. It may well be that there is land in the Chamorro Land Trust not covered by such a direction from the United States, but this court cannot discern that on the present record. Even without the other issues already raised in the present order, that issue alone precludes judgment for the United States at this time.

The other cases relied on by the United States are not persuasive. For example, the 1999 decision in *Government of Guam v. 6,390.56 Square Meters* is not conclusive of whether "native Chamorro" as defined in the Chamorro Land Trust Act is a racial

or political classification.  That case examined whether land should be part of the Chamorro Land Trust or whether the Guam legislature was allowed to remove land from the trust and give it to a private landowner as part of a land exchange.  *See* ECF No. 34-5, page 12 of 17.  Along the way, the court discussed whether the Chamorro Land Trust Act was a legitimate exercise of a public purpose:

> The intent of the Guam Legislature in passing the [Chamorro Land Trust Act] in 1973 was abundantly clear: "[t]he Government of Guam recognizes its special obligation to descendants of those persons who enjoyed peaceful ownership of their island lands prior to the catastrophic entry of the Federal presence with its confiscatory appetite for our land."  Guam Legislature Report of the Committee on Resources, Development and Agriculture.

*Id.*, Page 14 of 17.

The 1999 ruling questioned whether the Chamorro Land Trust Act was a legitimate exercise of a public purpose because, that ruling opined, it created a class based on race or ethnicity.  The court ultimately rejected Guam's contention that it was acting as a trustee with respect to the Chamorro Land Trust Act.  *Id.*, Page 15 of 18.  That rejection was founded on *Government of Guam ex rel. Guam Economic Development Authority*, 179 F.3d 630, in which the district court said that "the Ninth Circuit has clearly ruled that the Government of Guam is not the proper custodian or trustee for indigenous lands."  ECF No. 34-5,

page 16 of 17.  It is not clear to the present judge that the
Ninth Circuit's statement is controlling in the present case.  As
noted earlier, the Ninth Circuit made that statement while
discussing aboriginal land rights.  The land in issue here may or
may not rely on aboriginal title, but the actual focus is on the
taking of land during World War II, rather than on aboriginal
title.

In *Government of Guam ex rel. Guam Economic Development
Authority*, the Ninth Circuit addressed Guam's argument that the
United States was required to transfer 24,000 acres of land to
Guam that the United States no longer needed.  Guam argued that
Section 28(b) of the Organic Act of Guam, codified as 48 U.S.C.
§ 1421f(b), imposed an ongoing requirement on the United States
to transfer property to Guam whether the United States no longer
needed it.  179 F.3d at 633.  The Ninth Circuit rejected that
argument, determining that the plain meaning of the provision was
that the United States was making a one-time grant of property.
*Id.* at 633-35.

Guam also argued that it should be allowed to control
some of the land at issue under the doctrine of "aboriginal
title," which refers to the right of original inhabitants to use
and occupy their aboriginal territory.  *Id*. at 640.  Noting that
Guam was not a tribe and that no tribal member was a party, the
Ninth Circuit concluded that Guam had no "aboriginal right to use

or occupy tribal land." *Id.* The Ninth Circuit then rejected Guam's argument that it was a trustee with respect to aboriginal land rights, concluding that the Organic Act of Guam did not delegate such authority to Guam, instead retaining such authority for the federal government. *Id.* The heart of the decision in *Government of Guam ex rel. Guam Economic Development Authority* was the conclusion that the Organic Act had not delegated to Guam any trust authority over lands that had not been transferred to Guam. That case did not address whether such trust authority was delegated to Guam with respect to land that had been transferred to it, as in this case. *See id.*, 179 F.3d at 640 ("Congress can delegate its authority over aboriginal land rights."). Nor did that case address Guam's duties to administer transferred land for resettlement purposes. That case instead focused on Guam's claim of entitlement to have land transferred to Guam.

Finally, this court is unpersuaded by the United States' argument that Guam is estopped from disputing that the Chamorro Land Trust Act creates a racial classification. It is true that Guam at one point did refer to the Chamorro Land Trust Act as creating a racial classification. In *Santos v. Ada*, SP0083-92 (1993), petitioners sought to force the Governor of Guam to implement the Chamorro Land Trust Act, which had been passed but not implemented for decades. The Governor of Guam opposed, arguing that Chamorros did not qualify as an Indian

47

tribe for purposes of the *Morton* analysis and were therefore not
a political group. *See* ECF No. 34-4, Pages 12 and 19 of 27. The
Superior Court of the Territory of Guam rejected this argument,
ruling that the Governor of Guam was required to implement the
Chamorro Land Trust Act. *See* ECF No. 34-1. This court does not
hold Guam to a position a former Governor took years ago,
especially given the rejection by a court.

Three factors inform this court's decision not to apply
the doctrine of judicial estoppel: 1) whether the party's later
position is clearly inconsistent with its earlier position;
2) whether the party succeeded in persuading a court to accept
that party's earlier position, so that judicial acceptance of an
inconsistent position in a later proceeding would create the
perception that either the first or the second court was misled;
and 3) whether the party seeking to assert an inconsistent
position would derive an unfair advantage or impose an unfair
detriment on the opposing party if not estopped. *See Kobold v.
Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1045 (9th Cir.
2016).

While the Supreme Court has noted that "ordinarily the
doctrine of estoppel or that part of it which precludes
inconsistent positions in judicial proceedings is not applied to
states," *Illinois ex rel. Gordon v. Campbell*, 329 U.S. 362, 369
(1946), it nevertheless applied the doctrine of judicial estoppel

to preclude New Hampshire from taking an inconsistent position with a position it had successfully taken in an earlier case. *New Hampshire v. Maine*, 532 U.S. 742, 756 (2001). In so ruling, the Supreme Court recognized that a change in public policy may make it important to allow a change of positions. *Id.* Having unsuccessfully argued in the *Santos* case that the Chamorro Land Trust Act is race-based, Guam, in changing that position in this case, will not derive an unfair advantage or create a perception that either the *Santos* court or this one is being misled. This is simply not a case in which this court will apply an equitable doctrine to hold Guam to a position it asserted years ago that was rejected by the court in which Guam made the assertion. In so ruling, this court is also recognizing that there may have been a change in public policy with the different Guam administrations.

Because the United States has failed to demonstrate that the Chamorro Land Trust Act is based on an improper race or national origin classification, as opposed to relying on a political classification, the United States fails to meet its burden of demonstrating that it is entitled to judgment as a matter of law. For that reason, the United States' Motion for Partial Judgment on the Pleadings is denied. This court stresses that this denial is not intended to indicate that the United States has failed on the merits of any claim. Rather, this

denial is a ruling that the United States has failed at this point to make the showing needed for it to prevail.  Whether it can make such a showing is something this court has no way of knowing at this point.

      **B.**    **This Court Grants Guam's Motion for Judgment on the Pleadings in Part and Denies it in Part.**

Guam moves for judgment on the pleadings with respect to the remedies awardable against it if it is determined to have violated the Fair Housing Act.  Under 42 U.S.C. § 3614(d)(1), when the Attorney General brings an action with respect to alleged Fair Housing Act violations, courts may award declaratory and injunctive relief, monetary damages, and civil penalties, as well as such other relief as the court deems appropriate.  This court rules that money damages are not available in this case, but in all other respects Guam's motion is denied.

In its Motion for Judgment on the Pleadings, Guam asserts that it has Eleventh Amendment immunity with respect to the Fair Housing Act claims.  *See* ECF No. 35.  The court rejects Guam's Eleventh Amendment immunity assertion because actions by the United States against a state (or in this case, a territory) in federal court are not barred by the Eleventh Amendment.  *See United States v. Mississippi*, 380 U.S. 128, 140–41 (1965) (stating that Eleventh Amendment, by its terms, only bars suits against a state brought by citizens of that state, other states, or subjects of any foreign state); *Townsend v. Univ. of Alaska*,

543 F.3d 478, 484 n.1 (9th Cir. 2008) ("An action by the United States against a state in federal court is not barred by the Eleventh Amendment."); *Demery v. Kupperman*, 735 F.2d 1139, 1146 n.3 (9th Cir. 1984) ("The eleventh amendment does not bar suits against a state brought by the United States"); *see also United States v. City of Parma, Ohio*, 661 F.2d 562, 572 (6th Cir. 1981) (stating in dicta that it was the intent of Congress to provide for Fair Housing Act actions against states).

For the same reason, Guam's reliance on *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), for the proposition that it is not a "person" for purposes of the Fair Housing Act is misplaced. *Will* held that, while a state official is literally a person, a suit against a state official acting in his or her official capacity is a suit against the official's office and is the same as a suit against a state. *Will* therefore held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Id.* at 71. *Will* declined to read 42 U.S.C. § 1983 in a manner that would disregard the states' Eleventh Amendment immunity. *Id.* at 66-67. Because Eleventh Amendment immunity is not applicable in the present case, Guam's reliance on *Will* is unpersuasive. Accordingly, neither Guam nor its agencies or officers have Eleventh Amendment immunity with respect to the Fair Housing Act claims asserted by the United States.

As this case has progressed, Guam has clarified its position with respect to available remedies. Although its original moving papers appeared to assert a broad challenge to any form of relief, in the Reply memorandum it filed in support of its motion, Guam expressly narrowed that challenge to monetary relief and civil penalties. Guam now concedes that the United States may seek declaratory and injunctive relief against Guam for any violation of the Fair Housing Act that the United States may establish. *See* ECF No. 44, Page 2 of 10 ("The Government of Guam acknowledges there is an independent basis outside the Fair Housing Act (FHA) for the United States to bring actions for declaratory and injunctive relief against a state or a territory.").

In conceding that declaratory and injunctive relief may be awarded in this action, Guam says that must be pursuant to the Declaratory Judgment Act. *See* ECF No. 44, Page 2 of 10. Other courts have seen no need to resort to the Declaratory Judgment Act in awarding declaratory and/or injunctive relief in Fair Housing Act cases brought by the Attorney General against state entities. *See United States v. Univ. of Neb. at Kearney*, 940 F. Supp. 2d 974 (D. Neb. 2013) (determining that a state university's violation of the Fair Housing Act by refusing to allow a therapy dog to live with a student justified a Consent Order enjoining Fair Housing Act violations, 4:11-CV-3209, ECF

No. 290 (Sept. 4, 2015)); *United States v. Wis.*, 395 F. Supp. 732 (W.D. Wis. 1975) (finding a Fair Housing Act violation in a case seeking declaratory and injunctive relief directly under that act).

The gist of Guam's remaining argument is that relief other than declaratory and injunctive relief is not awardable because Guam is not a "person" for purposes of § 3614(a). This court is not persuaded by Guam's "person" argument with respect to § 3614(a).

There is no question that the United States Attorney General is authorized to bring this action for alleged violations of the Fair Housing Act. Section 3614(a) states:

> Whenever the Attorney General has reasonable cause to believe [1] that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or [2] that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

42 U.S.C. § 3614(a).

Guam seeks dismissal of any claim for a monetary award or civil penalty on the ground that § 3614 applies only to "any person or group of persons" resisting protection of Fair Housing Act rights, and that Guam is not a "person." But § 3614(a) is not limited to suits when "any person or group of persons is

engaged in a pattern or practice of resistance" to Fair Housing Act rights.  Instead, that section also allows the Attorney General to bring a civil action in this court whenever "any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance."  The requirement that an alleged offender be a "person" appears only in the "pattern and practice" portion of § 3614(a), while the "general public importance" portion of § 3614(a) focuses on alleged victims, rather than referring to the status of an alleged perpetrator.

The United States may satisfy either the "pattern and practice" or "general public importance" clause in proceeding with a Fair Housing Act claim.  *See United States v. Hunter*, 459 F.2d 205, 217 (4th Cir. 1972) ("The language of the section shows that Congress did not wish the Attorney General to enforce private civil rights created by the Act unless a specific violation has a measurable public impact in that it is either one of a pattern or practice of resistance or a case raising an issue of general public importance.  If neither prerequisite for relief existed, a district court would be required to refuse the relief sought by the Attorney General.").

The United States' claim that the Chamorro Land Trust Act involves impermissible race and/or national origin

discrimination easily falls within the "general public importance" clause, as the United States contends that non-native Chamorros are being denied rights guaranteed by the Fair Housing Act. There being no contention that the relief would be different depending on whether the United States proceeded under the "pattern and practice" clause or under the "general public importance" clause, this court need not here determine whether Guam is a "person" for purposes of the "pattern and practice" clause of § 3614(a).

It is not clear whether, in addition to making its "person" argument with respect to § 3614(a), Guam is also arguing that it is not a "person under § 3614(d)(1), which permits an award of "preventive relief" against "the person responsible for the violation" of § 3614(a). Even if the Territory of Guam itself were deemed not to be a "person" under § 3614(d), there is no question that Defendants Chamorro Land Trust Corporation and Administrative Director of the Chamorro Land Trust Corporation fall within the definition of "person" under the Fair Housing Act, which defines "person" as "includ[ing] one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries." 42 U.S.C. § 3602(d). Accordingly, this court

could enjoin the actions of those Defendants under § 3614(d)(1)(A) even if Guam were not a "person."

This court rules that the United States may not pursue money damages in this case. Under 42 U.S.C. § 3614(d)(1), a court in a civil action brought under § 3614(a):

> (A) may award such preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation of this subchapter as is necessary to assure the full enjoyment of the rights granted by this subchapter;
>
> (B) may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved; and
>
> (C) may, to vindicate the public interest, assess a civil penalty against the respondent–
>
> > (i) in an amount not exceeding $50,000, for a first violation; and
> >
> > (ii) in an amount not exceeding $100,000, for any subsequent violation.

42 U.S.C. § 3614(d)(1).

The Fair Housing Act's use of the word "including" in "such preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation" of the Fair Housing indicates that this court is not limited to awarding the enumerated types of relief, which include declaratory relief. 42 U.S.C.

§ 3614(d)(1)(A).  That does not necessarily mean, however, that money damages are available against Guam.

Section 3614(d)(1)(B) allows this court to "award such other relief as the court deems appropriate, including monetary damages to persons aggrieved."  While the Ninth Circuit has held that compensatory damages must be awarded under § 3614(d)(1)(B) if actual damages are proven, it has not done so in a case against a state or territory.  *See United States v. City of Hayward*, 36 F.3d 832, 839 (9th Cir. 1994).  This court therefore examines whether monetary damages may be awarded under the circumstances presented by this case against Guam.

In *Hayward*, which was a case brought by the United States against a municipality, the Ninth Circuit noted that "[a]llowing the court to award monetary relief to persons aggrieved avoids later duplicative litigation as such persons bring actions to vindicate their rights."  36 F.3d at 840 (quoting House Rep. No. 711, 100th Cong., 2d Sess., 40 (1988)), *reprinted in*, 1988 U.S.C.C.A.N. 2201).  The House Report quoted by the Ninth Circuit states that "Section [3614(d)] provides the types of relief a court may award in a civil action under this Section."  *Id.*  In other words, Congress intended that a court prevent duplicative litigation by awarding in a suit brought by the United States the same relief awardable had the aggrieved persons brought a Fair Housing Act claim themselves.

Here, had aggrieved persons asserted Fair Housing Act claims directly against Guam under § 3613 in this court, Guam would have had Eleventh Amendment immunity with respect to such claims. *See McCardell v. U.S. Dep't of Hous. & Urban Dev.*, 794 F.3d 510, 521 (5th Cir. 2015) (state defendants had Eleventh Amendment immunity with respect to Fair Housing Act claims brought by private party); *Brooks v. Oakland Univ.*, 2013 WL 6191051, at *2 (E.D. Mich. Nov. 26, 2013) (holding that the Eleventh Amendment barred Fair Housing Act claims asserted by a private party against a state university); *Kalai v. Hawaii*, 2008 WL 3874616, at *3 (D. Haw. Aug. 20, 2008) ("Plaintiff's FHA claims seeking damages against Defendant [State of Hawaii] are barred by the Eleventh Amendment."); *Kuchmas v. Towson Univ.*, 2007 WL 2694186, at *9 (D. Md. Sept. 10, 2007) ("this Court holds that the Eleventh Amendment bars private suits [under § 3613] against Towson University under the Fair Housing Act"); *Gregory v. S.C. Dep't of Transp.*, 289 F. Supp. 2d 721, 724-25 (D.S.C. 2003) (holding that the Eleventh Amendment barred private Fair Housing Act claims against South Carolina Department of Transportation).

The United States stated at the hearing held in this case on November 29, 2018, that any monetary award would not go to the United States Treasury but instead to individuals aggrieved by Guam's allegedly discriminatory actions. The United

States posited a trial at which each individual's damages would be set.  But while the Eleventh Amendment is generally inapplicable to claims brought by the United States, this court is hard-pressed to see why the Eleventh Amendment is similarly inapplicable to claims brought by the United States on behalf of individuals who could not sue directly for money damages.

If the purpose of allowing this court to award damages to "aggrieved persons" in § 3614 cases brought by the United States is to prevent duplicative litigation, that purpose is not served by allowing the United States to seek damages on behalf of persons who could not themselves be awarded damages in direct Fair Housing Act claims under § 3613 given Guam's Eleventh Amendment immunity.

The United States does not bring this lawsuit on behalf of persons who lack a private right of action.  Private parties are expressly allowed to sue on their own behalf under § 3613.  Allowing them to recover money damages in the lawsuit brought by the United States would not prevent duplicative litigation; it would instead give them a windfall they could not achieve if suing on their own behalf.  Monetary awards to them in this action by the United States would evade the Eleventh Amendment immunity Guam would enjoy with respect to direct claims by private parties.  Section 3614 was intended to provide the same relief available in other civil actions, not greater relief.  *See*

House Rep. No. 711, 100th Cong., 2d Sess., 40 (1988)), *reprinted in*, 1988 U.S.C.C.A.N. 2201.

To the extent Guam argues that this court may not award civil penalties against it because it is not a "person," Guam fails to meet its burden of persuasion. Guam points to no provision restricting civil penalties to a "person." Instead, § 3614(d)(1)(B) provides for civil penalties against the "respondent." The court is not here deciding that civil penalties are indeed available in this action, only that Guam has not met its burden on the present motion of showing that such civil penalties are unavailable.

If the issue of civil penalties is the subject of a future motion, the parties may want to address any conceptual similarities or differences between money damages, which this court is barring, and civil penalties. In that regard, the purpose of civil penalties may be worth exploring, as well as whether such penalties would play any role in enforcing any possible injunction that might be ordered. For example, if this court ordered an injunction, would enforcement of that injunction be limited to civil contempt or withholding of certain federal funding, or would monetary penalties be possible?

In any event, at this point, Guam's Motion for Judgment on the Pleadings is granted with respect to a bar on monetary damages, but denied in all other respects. Declaratory and

injunctive relief are available remedies assuming Guam is shown to have violated the Fair Housing Act, and Guam's request for a ruling that civil penalties are barred is denied without prejudice to this court's revisiting that issue based on fuller legal analysis than has been provided so far.

**IV.       CONCLUSION.**

The court denies the United States' motion seeking judgment on the pleadings.  The court also denies Guam's motion for judgment on the pleadings except with respect to the issue of monetary damages.  This court rules that monetary damages are not available against Guam in this case.

IT IS SO ORDERED.

DATED: December 21, 2018.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States of America v. Government of Guam, et al.*, Civ. No. 17-00113 ; ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND JOINDER THEREIN